Pierre BOULEZ, Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 82–1048.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1982.
Decided Feb. 13, 1987.

Lawrence D. Bernfeld, New York City, with whom Alfred R. McCauley, Washington, D.C., and Allen Greenberg, New York City, were on brief, for appellant.

Terry L. Fredericks, Atty., Dept. of Justice, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., and Michael L. Paup, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before WALD, Chief Judge, ROBINSON, Circuit Judge, and WRIGHT, Senior Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal summons us to adjudge the validity of an oral agreement between a taxpayer and an official of the Internal Revenue Service (IRS) purporting to compromise a disputed income tax liability. The United States Tax Court held the agreement ineffective on the ground that

the official lacked authority to enter into it.[1]  We affirm.

## I

The taxpayer, Pierre Boulez, is a citizen of France and a world-renowned music director and conductor.[2]  In 1971, Boulez contracted with Beacon Concerts, Ltd., a United Kingdom corporation,[3] to serve as director and conductor for musical organizations selected by Beacon.[4]  The latter in turn contracted to provide Boulez's services to the New York Philharmonic Symphony and the Cleveland Orchestra, both United States corporations.[5]

For tax years 1971 and 1972, Boulez was a nonresident alien for purposes of United States income taxes.[6]  During those years, Beacon received $207,473 for Boulez's performances in the United States[7] and, after deducting its expenses and commissions, paid Boulez $188,495.[8]  Boulez filed United States nonresident alien income tax returns for 1971 and 1972, but did not include in his gross income any of the monies Beacon received or paid to him for his services.[9]  Boulez continued to perform in the United States for the New York Philharmonic Symphony during 1973, 1974 and 1975.  He filed nonresident alien returns for the 1973 and 1974 tax years, and again failed to report any amount received by or from Beacon.[10]

In 1975, IRS launched an investigation of Boulez's tax obligations respecting the monies flowing through Beacon.[11]  Boulez obtained counsel,[12] who engaged in a protracted series of negotiations with IRS on Boulez's potential tax liability and assertedly reached an oral compromise [13] with IRS's Director of International Operations.[14]  Boulez claims that he was to file amended returns for 1973 and 1974 including in gross income the amounts paid to Beacon for his services in the United States; and that, in exchange, no adjustments were to be made by IRS, no payments for years prior to 1973 would be required, and no penalties for late filing or payment would be assessed.[15]

1.  *Boulez v. Commissioner,* 76 T.C. 209 (1981).

2.  Joint Appendix (J.App.) 43–44.

3.  J.App. 44.

4.  J.App. 44.  The contract was a "loan-out" agreement—one in which an artist contracts with a management company to arrange his bookings and consents to render services at the company's direction.  See J.App. 101–105 (agreement between Boulez and Beacon).

5.  J.App. 43–44, 106–132.

6.  J.App. 43.

7.  See Brief for Appellee at 3 & n. 1.

8.  J.App. 47.  Boulez expended $85,515 in performing in the United States in 1971 and 1972.  *Id.*

9.  J.App. 50–62; Brief for Appellee at 3.  See Rev.Rul. 74–330, 1974–2 C.B. 278; Rev.Rul. 74–331, 1974–2 C.B. 282.

10.  J.App. 46–47.

11.  J.App. 47.  In the course of its probe, IRS requested the Philharmonic to withhold for income tax purposes 30% of the gross amount paid to Beacon for Boulez's services.  See J.App. 45.

12.  J.App. 45.

13.  The Commissioner of Internal Revenue stipulated to the existence of the oral agreement, see J.App. 144–147, for the limited purpose of enabling the Tax Court to dispose of his motion for summary judgment.  *Boulez v. Commissioner, supra* note 1, 76 T.C. at 215 n. 9.  Consequently, we make the same assumption for purposes of our review.

14.  J.App. 46.  This official is now known as the Director, Foreign Operations District, but his duties are unchanged.  The Director administers the internal revenue laws on behalf of IRS as they relate to "foreign taxpayers deriving income from sources within the United States."  Treas.Reg. § 601.101(a) (1986).

15.  See Affidavit of Irving Moskovitz at 2, J.App. 141.

Boulez then filed amended 1973 and 1974 returns conforming to the compromise and remitted $53,841 in additional taxes.[16] Appended to the amended returns was a letter from Boulez's counsel stating that these returns were "in accordance with [counsel's] conversation with" the Director.[17]

Thereafter, Boulez did not oppose inclusion in his gross income for 1973 and years following of the amounts paid to Beacon for his performances in the United States.[18] He did not resist the applicability of any income tax convention to Beacon's receipts for or payments to him, nor did he seek any refund of taxes paid in consequence of the compromise. Ultimately, he terminated his arrangement with Beacon and personally assumed the obligations imposed on Beacon by the contract with the Philharmonic.[19]

In 1977, IRS commenced an unrelated audit of Boulez's 1975 return, and later expanded it to an examination of his 1971 and 1972 returns.[20] In 1978, IRS issued a notice of deficiency informing Boulez that he owed additional taxes for 1971 and 1972. Underlying the notice was a determination that Boulez should have included in his gross income for those years amounts paid to Beacon for his performances in the United States.[21]

Boulez challenged this ruling in the Tax Court[22] and moved for summary judgment on two grounds. He claimed that the 1976 oral agreement, which purported to settle any tax liability for 1971 and 1972, constituted a binding compromise.[23] Alternatively, Boulez asserted that if the agreement was not a bar, IRS was equitably estopped from assessing the deficiency because Boulez had relied upon the agreement and changed his position to his detriment.[24] The Tax Court held in favor of the Commissioner, reasoning that the Director of International Operations lacked authority to bind IRS by means of an oral agreement, because Treasury Regulation § 301.7122–1(d) requires offers and acceptances of compromise to be in writing.[25] From this decision, Boulez now appeals.

## II

Boulez presses two arguments in an effort to demonstrate that the Tax Court erred in refusing to grant summary judgment in his favor. He first contends that the Treasury Regulation § 301.7122–1(d) is invalid for inconsistency with Section 7122(a) of the Internal Revenue Code[26] which, he says, sanctions oral compromises. He further contends that even if the regu-

16. *Boulez v. Commissioner, supra* note 1, 76 T.C. at 209–211. J.App. 134.

17. Letter from Irving Moskovitz to Warren Josephs (Feb. 1, 1977), J.App. 134. IRS accepted the amended returns and imposed no penalties. J.App. 48.

18. Nor did Boulez contest the applicability to him of Rev.Ruls. 74–330, 1974–2 C.B. 278 or 74–331, 1974–2 C.B. 282, in which the Commissioner explained his position regarding foreign entertainers and loan-out arrangements. See *Boulez v. Commissioner, supra* note 1, 76 T.C. at 210.

19. *Id.* at 210–211.

20. J.App. 47.

21. J.App. 47.

22. *Boulez v. Commissioner, supra* note 1. Boulez chose to litigate only the legitimacy of the oral agreement; he did not claim entitlement to a refund of any part of the taxes he had paid. 76 T.C. at 211.

23. *Id.*

24. *Id.* at 211, 214.

25. *Id.* at 212–213. See Treas.Reg. § 301.7122–1(d) (1986) (quoted in relevant part *infra* note 33).

26. 26 U.S.C. § 7122(a) (1982), providing:

The Secretary or his delegate may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense.

lation imposes a valid limitation on statutory authority to compromise, it is merely directory, and that a delegation order empowered the Director of International Operations, as the Commissioner's delegate at the time of the agreement, to accept Boulez's oral offer of compromise and thus to bind the agency. We agree with Boulez that the statute does not of its own accord forbid oral compromise agreements, but conclude that the regulation, which requires that all compromises be reduced to writing,[27] has the force and effect of law, and that the Director lacked authority to waive it.

The Commissioner argues that Section 7122(a) of the Code manifests the intent of Congress to outlaw oral compromise agreements. The Commissioner concedes, as he must, that the section does not expressly call for a writing, but he maintains that when viewed against the backdrop of its legislative history, it should be read to incorporate that requirement. The question thus posed appears to be one of first impression.[28]

Undeniably, Section 7122(a) is facially ambiguous. It does not specify that compromise agreements must be in writing, nor does it explicitly sanction oral settlements. The legislative history, although cited by the Commissioner in support of his position, does not plainly settle the question either. When, more than a century ago, the provision authorizing compromise agreements was first drafted,[29] the bill made the written opinion of the Solicitor of Internal Revenue prerequisite to a valid compromise agreement.[30] This particular requirement appears to be the only precondition Congress considered incorporating into the statute. It was deleted from the final version, however, and has not reappeared in any successor statute.[31] We can

---

27. See Treas.Reg. § 301.7122–1(d) (1986) (quoted in relevant part *infra* note 33).

28. In *Botany Mills v. United States,* 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379, 385 (1929), the Court held that an "informal" or "gentlemen's" agreement made by subordinate agency officials without securing the consent of the Secretary did not constitute a binding agreement under the predecessor of § 7122, Act of July 20, 1868, ch. 186, § 102, 15 Stat. 166, Rev. Stat. § 3229. The Court did not address, however, the validity of oral compromise agreements per se. In *McIlhenny v. Commissioner,* 39 F.2d 356, 358 (3d Cir.1930), the court, also construing Rev.Stat. § 3229, alluded to the fact that "there was no agreement in writing," but added "or otherwise." *Country Gas Serv., Inc. v. United States,* 405 F.2d 147, 149–150 (1st Cir. 1969), involved the validity of an oral compromise agreement under § 7122, but the court based its rejection of the agreement on the agent's lack of authority and did not discuss the need for a writing.

29. The precursor of 26 U.S.C. § 7122(a) (1982) may be found in the Act of July 20, 1868, ch. 186, § 102, 15 Stat. 124, 166, and was carried forward into the Internal Revenue Code of 1939 as § 3761.

30. Senator Sherman, the proponent of this requirement, explained that its purpose was to ensure "that the Commissioner of Internal Revenue shall never make a compromise until after a full and fair investigation." Cong. Globe, 40th Cong., 2d Sess. 3773 (1868) (statement of Sen. Sherman). The object of the provision was "to see that the Commissioner has all the facts before him, prepared by an officer who is supposed to be a lawyer." *Id.* (statement of Sen. Sherman). In the course of the floor debate that ensued over this proposal, the Senator never addressed the question whether compromise agreements had to be reduced to writing before they were binding. As he understood his amendment, it served only as a check on the power of the Commissioner to enter into settlements:

> Now we provide that no compromise can be made except with the written assent of the Secretary of the Treasury; and further than that, in order to show that it cannot be done upon insufficient information, we require another officer to file his opinion in writing, setting out certain facts, the basis of the opinion by the Secretary of the Treasury.

*Id.* at 3775 (statement of Sen. Sherman).

31. The Commissioner relies heavily upon a recently-excised section of a related statute concerning compromises reached after entry of a judgment. 31 U.S.C. § 194 (1976) provided:

> Upon a report by a United States attorney, or any special attorney or agent having charge of any claim in favor of the United States, showing in detail the condition of such claim, and the terms upon which the same may be compromised, and recommending that it be compromised upon the terms so offered, and upon the recommendation of the General Counsel for the Department of the Treasury,

find no suggestion that Congress, in the course of its deliberations, otherwise considered the form that compromise agreements should take. We thus are persuaded that Congress left to the Secretary of the Treasury the task of promulgating regulations addressing the requisite manner of offer and acceptance of compromises.[32]

### III

The Secretary has issued Treasury Regulation § 301.7122–1(d), which specifically requires a written offer and acceptance.[33] Boulez acknowledges that the compromise upon which he relies did not satisfy this demand, but claims that the regulation conflicts with the statute. Boulez further claims that breach of the regulation should not affect the validity of the compromise agreement because the regulation is merely directory in character and because in any event the Director, as the Secretary's delegate, had authority to waive it in his instance. We find each of these arguments unpersuasive.

We address first the contention that the regulation contravenes the intent of Congress.[34] To prevail on this argument, Boulez must overcome the strong presumption of validity to which Treasury regulations are entitled.[35] The Supreme Court has con-

---

the Secretary of the Treasury is hereby authorized to compromise such claim accordingly....

But this section did not in terms require the Secretary to reduce compromises to writing. Moreover, §§ 194 and 7122 were not enacted contemporaneously, neither provision referred to the other, and § 194 was finally repealed in 1978. Act of Nov. 6, 1978, Pub.L. No. 95–598, § 322(c), 92 Stat. 2549, 2679. We cannot see how this defunct provision, which contained no explicit or implicit requirement of a writing and which dealt only with post-judgment compromises, sheds any light on the legislative intentions animating § 7122(a).

**32.** The Commissioner attempts to minimize the omission of a writing requirement in § 7122(a) by emphasizing instead the written-record requirement of § 7122(b):

> (b) **Record.**—Whenever a compromise is made by the Secretary or his delegate in any case, there shall be placed on file in the office of the Secretary or his delegate the opinion of the General Counsel for the Department of the Treasury or his delegate, with his reasons therefor, with a statement of—
> (1) The amount of tax assessed,
> (2) The amount of interest, additional amount, addition to the tax, or assessable penalty, imposed by law on the person against whom the tax is assessed, and
> (3) The amount actually paid in accordance with the terms of the compromise....

26 U.S.C. § 7122(b) (1982). Insisting that creation of a written record is a statutory prerequisite to settlement of a tax dispute, the Commissioner argues that the absence of such a record in this case renders the oral compromise without legal effect. Brief for Appellee at 16.

The Tax Court found it unnecessary to resolve this question, *Boulez v. Commissioner, supra* note 1, 76 T.C. at 214 n. 8. We likewise reserve

decision on the question whether § 7122(b)'s call for a written record is directory or mandatory. We note, however, that the Commissioner does not distinguish between the authority to utilize compromise agreements conferred by § 7122(a), which surely cannot be doubted when the agreements are in writing, and the responsibility for maintaining records of such compromise agreements imposed upon the Department of the Treasury by § 7122(b). To the extent that the Commissioner suggests that the taxpayer's failure to produce a § 7122(b) record invalidates a compromise authorized by § 7122(a), the argument may carry little weight, for noncompliance with § 7122(b) can hardly be reasonably charged to the taxpayer, who is powerless to effect it.

**33.** Treas.Reg. § 301.7122–1(d) (1986) in relevant part provides:

> **Procedure with respect to offers in compromise—**
> (1) **Submission of offers.** Offers in compromise shall be submitted on forms prescribed by the Internal Revenue Service which may be obtained from district directors of internal revenue, and should generally be accompanied by a remittance representing the amount of the compromise offer or a deposit if the offer provides for future installment payments....
> (3) **Acceptance.** An offer in compromise shall be considered accepted only when the proponent thereof is so notified in writing....

**34.** See Reply Brief for Appellant at 19–20.

**35.** E.g., *Poirier & McLane Corp. v. Commissioner,* 547 F.2d 161, 167 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977); *Beal Foundation v. United States,* 559 F.2d 359, 361 (5th Cir.1977); *United Telecommunications, Inc. v. Commissioner,* 589 F.2d 1383, 1387 (10th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2839, 61 L.Ed.2d 284 (1979).

sistently declared that a Treasury regulation must be complied with unless the taxpayer can demonstrate that it is " 'unreasonable and plainly inconsistent with the revenue statutes.' "[36]

It is evident that Boulez has not discharged this burden. The crux of his argument is that Section 7122 sanctions oral compromises and that the Secretary cannot by regulation impose additional requirements that undermine the congressional purpose.[37] To be sure, courts will not hesitate to invalidate treasury regulations that do not reasonably adhere to statutory dictates or which frustrate legislative objectives,[38] but this case presents neither situation. Congress, in enacting Section 7122, empowered the Secretary to compromise disputed tax liabilities, but left to the Secretary the mechanics of effecting settlements.[39] In turn, the Secretary in specifying in Treasury Regulation § 301.7122-1(d) [40] that all offers of compromise be submitted and accepted in writing,[41] simply defined the form that compromise agreements must take. We find the requirement of a writing entirely reasonable, and a wholly permissible interpretation of Section 7122.

When, therefore, the parties negotiated the compromise of Boulez's 1971–74 tax liability, they did so subject to the terms of the regulation, one of which is that the compromise agreement be in writing. Moreover, the regulation provides that "offers in compromise shall be submitted on forms prescribed by the Internal Revenue Service ...," [42] and warns that "[a]n offer in compromise shall be considered accepted only when the proponent thereof is so notified in writing." [43] In the face of so unambiguous a mandate, we must adjudge the oral compromise devoid of binding effect unless for some reason it did not obtain in this case.

Acknowledging the compromise in issue was never reduced to writing in accordance with the strictures of the regulation, Boulez contends the oversight was inconsequential. The regulation, he asserts, is merely a procedural specification, directory and not mandatory in nature, whose breach should not affect the enforcement of the compromise agreement.[44] To demand full compliance with its terms, he says, is to adhere to a "technical procedural approach" that " 'would [ ...] sacrifice the principle of compromise to [the] mere form of procedure.' " [45]

We emphatically reject Boulez's characterization of the regulation, as well as his estimate of the significance of its breach. The authority on which Boulez relies in labeling the regulation directory concerns, not Part 301, but Part 601 of the Treasury regulations, otherwise known as the

---

**36.** *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140, 151 (1981) (quoting *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831, 836 (1948)); accord *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 533 n. 11, 99 S.Ct. 773, 781 n. 11, 58 L.Ed.2d 785, 796 n. 11 (1979); *Fawcus Mach. Co. v. United States,* 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397, 399 (1931).

**37.** See Reply Brief for Appellant at 19–20.

**38.** See, e.g., *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982); *Rowan Cos. v. United States,* 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981).

**39.** See text *supra* at notes 29–32.

**40.** The Secretary has not himself designated officers who may negotiate and accept compro-

mises, but instead has chosen to delegate the task of designation to the Commissioner. See Treas. Dep't Order No. 150–25, 18 Fed.Reg. 3238 (1953), as amended by Order No. 150–36, 1954–2 C.B. 733.

**41.** See Treas.Reg. § 301.7122–1(d) (1986) (quoted in relevant part *supra* note 33).

**42.** Treas.Reg. § 301.7122–1(d)(1) (1986) (quoted in relevant part *supra* note 33).

**43.** *Id.* § 301.7122–1(d)(3) (quoted in relevant part *supra* note 33).

**44.** Brief for Appellant at 36–38.

**45.** Brief for Appellant at 39 (quoting *United States v. Wainer,* 240 F.2d 595, 598 (7th Cir.), *cert. denied,* 355 U.S. 815, 78 S.Ct. 15, 2 L.Ed.2d 32 (1957)).

"Statement of Procedural Rules." [46] Part 601 rules differ significantly from the regulations here in question. Issued by the Commissioner, without need for approval by the Secretary, they serve merely as guidelines for conducting the internal affairs of the agency. The authority of the Commissioner to issue such rules derives from a statute empowering him to promulgate rules "for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of the records, papers, and property." [47] As such, the Statement of Procedural Rules is held to be directory, not mandatory in nature. [48]

■ By contrast, it is the Secretary who possesses the authority to "prescribe all needful rules and regulations for the enforcement" of the internal revenue laws. [49] These regulations, when consistent with and reasonably adapted to enforcement of those statutes, have the force of law. [50] Treasury Regulation § 301.7122–1(d), promulgated by the Secretary pursuant to this statutory grant, announces the prerequisites to binding compromises under Section 7122. Its terms are mandatory, not directory in character. [51]

**46.** Treas.Reg. pt. 601 (1986). See Brief for Appellant at 36–38 (citing *Luhring v. Glotzbach,* 304 F.2d 560 (4th Cir.1962); *Hamilton v. United States,* 324 F.2d 960, 963, 163 Ct.Cl. 116 (1963); *Bonacci v. Commissioner,* 46 T.C.M. 714, 718 (1977)).

**47.** 5 U.S.C. § 301 (1982); see 26 C.F.R. § 601.-101–.109 (1986); see also *Rosenberg v. Commissioner,* 450 F.2d 529, 531 (10th Cir.1971) (procedural rules of Part 601 "are not Treasury Decisions or Regulations").

**48.** *Luhring v. Glotzbach, supra* note 46, 304 F.2d at 565; *Einhorn v. DeWitt,* 618 F.2d 347, 348–349 (5th Cir.1980); *Smith v. United States,* 478 F.2d 398, 400 (5th Cir.1973) ("the provisions of the Statement of Procedural Rules are merely directory, and not mandatory"); *Rosenberg v. Commissioner, supra* note 47, 450 F.2d at 532–533. Cf. *United States v. Horne,* 714 F.2d 206, 207 (1st Cir.1983) (provisions of Internal Revenue Manual, like Statement of Procedural Rules, are not mandatory and lack force of law); *United States v. Will,* 671 F.2d 963, 967 (6th Cir.1982) (Internal Revenue Manual "adopted solely for the internal administration of the IRS, rather than for the protection of the taxpayer, does not confer any rights upon the taxpayer"); *Cleveland Trust Co. v. United States,* 421 F.2d 475, 481–482 (6th Cir.), *cert. denied,* 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed.2d 46 (1970) (revenue procedure held to be directory, not mandatory).

**49.** 26 U.S.C. § 7805(a) (1982).

**50.** See note 36 *supra* and accompanying text; see also *United States v. Correll,* 389 U.S. 299, 305–306, 88 S.Ct. 445, 449, 19 L.Ed.2d 537, 542–543 (1967) (invoking "the settled principle that 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law' ") (*quoting Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52, 55 (1938)).

**51.** See *Shumaker v. Commissioner of Internal Revenue,* 648 F.2d 1198, 1199–1200 (9th Cir. 1981) ("IRS regulations establish[ing] the procedures for closing agreements and compromises pursuant to 26 U.S.C. § 7121, 7122 … are exclusive") (citations omitted) (neither IRS' informal acceptance of taxpayer's amended returns nor adjustments to his tax crediting him with amount in controversy constitute a binding agreement under the tax laws).

Boulez argues that the regulatory scheme itself suggests that the Secretary intended to permit his delegate to waive the express writing requirement of Treas.Reg. § 301.7122–1(d). Noting that subsection (d)(1) of the regulation provides that offers in compromise must be submitted on forms prescribed by IRS, see note 33 *supra,* and that Treas.Reg. § 601.203(b) (1986) identifies Form 656 as the form appropriate for § 301.7122–1(d) submissions, Boulez observes that Form 656 pertains to cash-tender compromises, and so could not have served to record the compromise agreement stipulated in the instant case. Since the authority of the Secretary to compromise pursuant to 26 U.S.C. § 7122(a) is not limited to receipt of a cash tender, Boulez contends that residual discretionary authority over compromise procedure is retained by the Secretary despite the specific language of § 301.7122–1(d). From this he concludes that the Secretary or his delegate may dispense with the writing requirement without affecting the validity of the compromise. See Reply Brief for Appellant at 17–18.

We are unmoved by this argument. We are asked to infer from the fact that the Treasury regulations do not specify the full array of forms appropriate for § 301.7122–1(d) submissions an intent to invest the Secretary's delegates with discretion to waive the requirement of a written submission, and this, we think,

■ Boulez's claim that exacting compliance with the writing requirement of Treasury Regulation § 301.7122–1(d) reflects a "technical procedural approach" to the Treasury regulations is simply untenable. We are not dealing with a mere housekeeping provision, but with a fundamental tenet of formalizing agreements. Unlike procedures governing the internal affairs of IRS,[52] the writing requirement of Treasury Regulation § 301.7122–1(d) confers rights and imposes liabilities on third parties—as Boulez would be the first to insist if tables were turned and IRS invoked an oral compromise agreement against him. Conditioning the enforceability of Section 7122 compromise agreements on compliance with the writing requirement of Treasury Regulation § 301.7122–1(d) hardly evinces a hypertechnical approach to application of the rules.[53]

## IV

Boulez nonetheless maintains that even if the regulation is not precatory in nature, the Director of International Operations had authority to waive it in his instance.[54] He asserts that Delegation Order No. 11,[55]

---

defies common sense. Incomplete identification of the relevant forms for submissions may indicate latitude with respect to the form on which the submission is recorded, but not with respect to the recording requirement generally. The terms of Treas.Reg. § 301.7122–1(d) bear out this reading. While subsection (d)(1), pertaining to the submission of offers in compromise, refers to submissions on prescribed forms, subsection (d)(3), pertaining to acceptances of offers in compromise, states in broad terms that "[a]n offer in compromise shall be considered accepted only when the proponent thereof is so notified in writing." Treas.Reg. § 301.7122–1(d)(3) (1986). Clearly, incomplete identification of forms for § 301.7122–1(d) submissions in no way alters the requirement of the regulation that such submissions be rendered in writing.

52. Cf. *Smith v. United States, supra* note 48, 478 F.2d at 400 (IRS claims valid despite breach of directory rules providing for mailing of notice of disallowance to taxpayer's "recognized representative" and for mailing taxpayer 30–day letter prior to issuance of statutory notice of disallowance); *Rosenberg v. Commissioner, supra* note 47, 450 F.2d at 532–533 (IRS claims valid despite breach of directory rules providing for prelitigation conference with taxpayer, where taxpayer provided full hearing and determination de novo in Tax Court).

53. Our holding in this case is thus consistent with the ruling in *United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619 (1933), where the Supreme Court held the IRS obliged to countenance amendment of a taxpayer's filing to conform to a Treasury regulation ordering the grounds for a refund suit to be described in the initial claim. As the purpose of the provision was to ensure notice to the Commissioner of the various claims the taxpayer was seeking to assert, and the taxpayer's belated attempt to amend his refund claim would afford the requisite notice, the Court concluded flexible application of the regulation to

be appropriate. *Id.* at 69–73, 53 S.Ct. at 281–282, 77 L.Ed. 623–626.

Boulez's attempt to read *Memphis Cotton* as broadly sanctioning waiver of Treasury regulations, see Reply Brief for Appellant at 17, is unavailing. First, the Court in *Memphis Cotton* explicitly rested its holding on the general trend toward liberalizing pleading requirements, see *id.* at 72, 53 S.Ct. at 282, 77 L.Ed. at 625, a concern of little relevance here. Second, unlike the situation in *Memphis Cotton*—involving a taxpayer's attempt to satisfy regulatory requirements by amending a filing in a manner which posed no disruption to the orderly disposition of his claim—the so-called "waiver" here sought is intended to nullify a regulatory requirement precisely to enable Boulez to foreclose IRS from exploring his 1971–72 tax liability. By requiring documentation of the terms of compromise agreements, Treas.Reg. § 301.7122–1(d) seeks to protect both the taxpayer and the Commissioner from disputes such as the one before us. The flexibility counseled by *Memphis Cotton* in no respect compels us to tolerate breach of no fundamental and sensible a rule as the documentation requirement imposed by § 301.7122–1(d).

54. Brief for Appellant at 26–35.

55. Delegation Order No. 11 (Rev. 6), 1971–1 C.B. 653, in relevant part provides:

**Delegation of Authority to Accept or Reject Offers of Compromise.**

Pursuant to the authority vested in the Commissioner of Internal Revenue ... it is hereby ordered:

1. District Director, Assistant District Director, the Director of International Operations and the Assistant Director of International Operations are delegated authority, under section 7122 of the Internal Revenue Code, to accept offers in compromise in cases in which the liability sought to be compromised (including any interest, additional amount, addition to the tax, or assessable

which empowered the Director to accept offers to compromise under Section 7122, does not confine itself to instances of full compliance with applicable regulations, and thus enabled the Director to enter into the oral agreement with Boulez's counsel.[56] Put another way, Boulez insists that the Director's authorization was not limited by Treasury Regulation § 301.7122–1(d).[57]

This argument is flawed in two respects. First, the power conferred by Delegation Order No. 11 to enter into compromise agreements is sharply circumscribed by Revenue Procedure 64–44:

> This is a "limited" delegation to the extent that the delegated authority must be exercised in accordance with the limitations prescribed by section 301.7122–1 of the Regulations on Procedure and Administration and with procedures established by the National Office.[58]

Since the regulation calls for compromise agreements in writing, it is clear that the Commissioner, in delegating to the Director authority to compromise disputed tax claims, could not have intended that it could be exercised in contravention of the regulation.

To circumvent the limiting language of Revenue Procedure 64–44, Boulez points out that it specifically referred to Delegation Order No. 11 (Rev. 3),[59] and argues that it was "rendered obsolete" by Delegation Order No. 11 (Rev. 4),[60] the order in effect at the time of the compromise agreement in suit.[61] Boulez contends that because Revision 4 did not contain the phrase "subject to limitations contained in applicable regulations and procedures," the authority of the Director of International Operations was not curtailed by Treasury Regulation § 301.7122–1(d).

We may easily reject this argument. We are in complete accord with the Tax Court's conclusion that "in light of the clear reference to the limitations prescribed by sec. 301.7122–1, Proced. & Admin.Regs., set forth in Rev.Proc. 64–44, repetition of that language in subsequent revisions of Delegation Order No. 11 would have been superfluous."[62] Revenue Procedure 64–44 continued in force at all times relevant to this case and was not superseded until 1980 when Revenue Procedure 80–6[63] was issued. Significantly, Revenue Procedure 80–6 contains virtually identical language, requiring the delegated authority to be exercised in accordance with the strictures of Treasury Regulation § 301.7122–1.[64]

More deeply, Boulez's assertion that the delegation order empowered the Director to waive application of the writing requirement—either because the order lacked restricting language or by virtue of some authority inherent in its terms—misconceives the nature of the delegation here. Whatever discretion the delegation order conferred upon the Director was discretion to compromise claims of tax liability, not the procedure by which compromise agreements were to be formalized.[65] Acting in

---

penalty) is less than $100,000, to accept offers involving specific penalties, and to reject offers in compromise regardless of the amount of liability sought to be compromised.

**56.** Brief for Appellant at 26–28.

**57.** Brief for Appellant at 26–35.

**58.** Rev.Proc. 64–44, 1964–2 C.B. 974.

**59.** See 1963–2 C.B. 732.

**60.** 1968–1 C.B. 735.

**61.** See Brief for Appellant at 32.

**62.** *Boulez v. Commissioner, supra* note 1, 76 T.C. at 213 & n. 6. Moreover, Delegation Order No.

11 (Rev. 4) explicitly relies on Treas. Reg. § 301.7122–1 as one of its sources of authority. 1968–1 C.B. 735, 736.

**63.** 1980–1 C.B. 586, 589.

**64.** See *id.* at 587.

**65.** Indeed, we do not see how a delegation order, promulgated by the Commissioner without the specific approval of the Secretary could of its own accord override a Treasury regulation promulgated by the Secretary pursuant to his statutory authority.

contravention of a regulation governing execution of compromise agreements, the Director was as much without authority to join in the oral arrangement with Boulez's counsel as he would have been had power to compromise never been delegated to him.[66]

■ On this appeal, Boulez has abandoned the estoppel arguments he urged upon the Tax Court,[67] and so relieves us of the necessity of addressing them here.[68] He does, however, renew his equitable arguments in the form of a policy argument to the effect that taxpayer confidence in the revenue system is best served by en-forcement of oral agreements of the character at issue.[69] We think, to the contrary, that confidence in the system is promoted by even-handed application of publicly-accessible regulations, especially where, as here, their purpose is to minimize disputes over the existence and terms of agreements between taxpayers and the Government of the type giving rise to the instant litigation. Indeed, when a compromise of tax liability is at issue, the need for rigorous compliance with pertinent regulations may be at its greatest, for not only the integrity of the public fisc but also public faith in the equitable enforcement of the tax laws hangs in the balance. The writing requirement of Treasury Regulation

---

**66.** Cf. *Botany Worsted Mills v. United States,* 278 U.S. 282, 288, 49 S.Ct. 129, 131, 73 L.Ed. 379, 385 (1929) (compromise of tax liability lacked binding effect where executed by subordinate officials in IRS and approved by Commissioner but never ratified by Secretary as required by statute); *Country Gas Serv., Inc. v. United States, supra* note 28, 405 F.2d at 149–150 (no binding compromise of tax liability where agreement undertaken by official of IRS lacking explicit delegation of authority).

**67.** See *Boulez v. Commissioner, supra* note 1, 76 T.C. at 214–217.

**68.** Claims of estoppel arising from the behavior of governmental employees may be asserted only in a narrow category of circumstances. The Tax Court held that the circumstances stipulated in this case fell outside that category. See *id.* Though we are not called upon to address Boulez's estoppel claim on this appeal, we think his attempt to reiterate equitable arguments in the language of public policy, see text *infra* at note 69, warrants mention of the principles framing governmental estoppel. First, those who deal with the Government are charged with knowledge of applicable statutes and regulations. The Supreme Court delivered this warning in unequivocal terms in *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947):

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or through the rulemaking power.... Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.

*Id.* at 384–385, 68 S.Ct. at 3, 92 L.Ed. at 15 (citations omitted). Furthermore, courts called upon to recognize equitable claims emanating from the conduct of government employees who provide erroneous information or act in a manner inviting reliance cannot evaluate such claims as though the transaction were merely between private parties. "The oft-quoted observation ... that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Id.* (quoting *Rock Island, A. & I. R.R. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, 189 (1920)). The principle is no different where the requirement is promulgated by the agency charged by Congress with administering a statute. *Id.; Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam). Finally, no distinction between substantive and procedural requirements suffices to mitigate the court's responsibility to ensure observance of regulations governing claims on the public fisc. *Id.* at 790, 101 S.Ct. at 1472, 67 L.Ed.2d at 690 ("[a] court is no more authorized to overlook the valid *regulation* requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits").

**69.** Brief for Appellant at 41–42.

§ 301.7122–1(d) is a legally reasonable and an administratively sound condition to attach to exercises of delegated authority to compromise disputed tax liabilities, and justice is plainly served by consistent adherence to it.

The judgment of the Tax Court is accordingly

*Affirmed.*