T.C. Memo. 1999-424

UNITED STATES TAX COURT

ESTATE OF EILEEN K. BROCATO, DECEASED, NINA CIMARELLI
AND LEON SCHILLER, CO-EXECUTORS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18887-97.                    Filed December 29, 1999.

<u>Keith Schiller</u>, for petitioners.

<u>Kevin G. Croke</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of

$1,373,797 in the Federal estate tax of the Estate of Eileen K.

Brocato (petitioner).

Unless otherwise indicated, all section references are to

the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure.

After a concession by respondent,[1] the issue for our decision is whether respondent is equitably estopped from assessing additional estate tax. If we find that respondent is not estopped, we must decide the proper amount of blockage and fractional interest discounts to be applied to petitioner's nine real properties.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference.

Eileen K. Brocato (decedent) died on April 12, 1993. At the time of her death, decedent resided in San Anselmo, California.

On June 30, 1994, coexecutors Nina Cimarelli and Leon Schiller filed an estate tax return (the return) on behalf of petitioner. At the time the petition was filed, the coexecutors resided in San Francisco, California.

Family Background

Decedent was predeceased by her husband, John Brocato (Mr. Brocato). Under the terms of Mr. Brocato's will, his estate passed into a testamentary trust for the benefit of decedent

---

[1] Respondent concedes that the value of the property located at 40 Legend Road, San Anselmo, California, was $231,625, as reported on decedent's estate tax return.

until her death.  Upon decedent's death, the remainder of Mr. Brocato's estate was distributed predominantly to his sisters, Nina Cimarelli and Anne Ghiselli.

Decedent's estate passed under the Eileen K. Brocato Living Trust (decedent's trust).  Under the terms of decedent's trust, decedent's grandchildren and the children of Nina Cimarelli and Anne Ghiselli received outright monetary gifts.  The remainder of decedent's trust was distributed as follows: One-third in trust for the benefit of Anne Ghiselli, one-third in trust for the benefit of decedent's son Thomas Brocato, one-sixth in trust for the benefit of Nina Cimarelli, and one-sixth in trust for the benefit of Alfred Cimarelli, Nina's husband.

Decedent's Interest in Real Properties

At the time of decedent's death, decedent's trust included the following nine real properties (collectively, the Brocato properties):

(1)  25 Cervantes Boulevard, an 18-unit apartment building (25 Cervantes)

(2)  3637 Fillmore Street, an 18-unit apartment building (3637 Fillmore)

(3)  2395 Francisco Street, an 18-unit apartment building (2395 Francisco)

(4)  15 and 27 Alhambra Street, a 12-unit apartment building (15 Alhambra)

(5)  2360-2370 Chestnut Street, a 42-unit apartment building (2360 Chestnut)

    (6)   2000 Beach Street, an 18-unit apartment building
           (2000 Beach)

    (7)   101 Capra Way, a 15-unit apartment building,
           wherein decedent owned a 50-percent interest
           (101 Capra)

    (8)   3737 Fillmore Street, a 15-unit apartment
           building, wherein decedent owned a 50-percent
           interest (3737 Fillmore)

    (9)   1359-61 Bay Street, a duplex house, wherein
           decedent owned a 50-percent interest (1359 Bay)

All of the above properties are located in the Marina District of San Francisco, California. The Marina District is one of several desirable districts in which to reside in San Francisco. The 101 Capra, 3737 Fillmore, and 1359 Bay properties (collectively, the fractional interest properties) were held by decedent and Mr. Brocato as tenants in common during their lives, each owning a 50-percent interest.

The parties agree that the values of decedent's interests in the nine properties before applying discounts are as follows:

| | | |
|---|---|---|
| (1) | 25 Cervantes | $1,640,000 |
| (2) | 3637 Fillmore | 1,293,000 |
| (3) | 2395 Francisco | 1,058,000 |
| (4) | 15 Alhambra | 914,000 |
| (5) | 2360 Chestnut | 2,875,000 |
| (6) | 2000 Beach | 1,173,000 |
| (7) | 101 Capra | 619,000 |
| (8) | 3737 Fillmore | 593,000 |
| (9) | 1359 Bay | 267,000 |
| | Total | 10,432,000 |

The Closing Letter

On the return filed June 30, 1994, petitioner reported the value of the Brocato properties based on an appraisal report by

David P. Rhoades & Associates, Inc. (Rhoades report).  In the spring of 1995, Marc Samuelson (Mr. Samuelson), an estate tax attorney for the Internal Revenue Service (IRS), began an audit of the return.

On June 26, 1995, an IRS engineer issued a review report concluding that the values before discounts determined in the Rhoades report were acceptable, but the amounts of the discounts claimed were unacceptable.  Mr. Samuelson made a settlement proposal to petitioner, but petitioner rejected it.  On October 10, 1995, Mr. Samuelson told petitioner's counsel that respondent would not be relying on the IRS engineer's report and respondent would be hiring an appraiser to value the properties.  He informed petitioner's counsel that this process would take at least 3 months, and he would contact counsel when the expert was hired.

On November 14, 1995, petitioner filed a supplemental estate tax return (the supplemental return) with respondent's Ogden Service Center claiming an interest deduction.  On December 14, 1995, the Ogden Service Center erroneously issued petitioner a closing letter in response to the supplemental return.  The closing letter provided:

This is not a formal closing agreement under Section 7121 * * *.  However, we will not reopen this return unless:  (1) There is evidence of fraud, malfeasance, collusion or misrepresentation of a material fact; (2) a substantial error, based upon an established service position, existing at the time of the prior closing; or (3) other circumstances exist which indicate that a failure to reopen would result in a serious administrative omission.

A clerk at the Ogden Service Center issued the closing letter without referring to the transcript of petitioner's account which would have revealed that an examination was in progress and a closing letter should not be issued.

On May 20, 1996, petitioner sold 2360 Chestnut.  Neither petitioner nor its counsel contacted Mr. Samuelson or any other IRS employee to seek an explanation of the closing letter before selling 2360 Chestnut.

Unaware of the erroneous closing letter, on June 24, 1996, Mr. Samuelson sent petitioner's counsel a letter informing him that the IRS was still in the process of hiring an appraiser. On July 2, 1996, petitioner's counsel responded and stated that the continuing audit was contrary to the closing letter.  On August 19, 1996, the IRS notified petitioner of its intent to reopen the examination of decedent's estate tax return on the grounds that a serious administrative omission had occurred which "would result in criticism, undesirable precedent, or inconsistent treatment."

OPINION

I.  Estoppel

We must first decide whether respondent is equitably estoppel from determining additional estate taxes against petitioner.  The U.S. Supreme Court has stated that the Government may not be estopped on the same grounds as a private person.  See OPM v. Richmond, 496 U.S. 414, 419 (1990); Heckler v. Community Health Servs., 467 U.S. 51, 60 (1984).  It is well established that the estoppel doctrine should be applied against the Commissioner with the utmost caution and restraint.  See Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987); Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977).

> The traditional elements of estoppel include:
>
> (1) Conduct constituting a [mis]representation of material fact; (2) actual or imputed knowledge of such fact by the representor; (3) ignorance of the fact by the representee; (4) actual or imputed expectation by the representor that the representee will act in reliance upon the representation; (5) actual reliance thereon; and (6) detriment on the part of the representee. * * * [Graff v. Commissioner, 74 T.C. 743, 761 (1980).]

See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995); Hudock v. Commissioner, 65 T.C. 351, 363 (1975).  The U.S. Court of Appeals for the Ninth Circuit, to which the present case is appealable, requires two additional elements in order to estop the Government:  (1) Affirmative misconduct going beyond mere

negligence by the Government, and (2) the Government's wrongful act causes a serious injustice and the public's interest does not suffer undue damage by imposition of estoppel.  See <u>Watkins v. United States Army</u>, 875 F.2d 699, 707 (9th Cir. 1989).

Affirmative misconduct requires an affirmative misrepresentation or affirmative concealment of a material fact by the Government.  See <u>United States v. Ruby Co</u>, 588 F.2d 697, 703-704 (9th Cir. 1978).  Affirmative misconduct must be more than negligence, but it does not require that the Government intends to mislead.  See <u>United States v. Hatcher</u>, 922 F.2d 1402, 1410 (9th Cir. 1991); <u>S&M Inv. Co. v. Tahoe Regl. Planning Agency</u>, 911 F.2d 324 (9th Cir. 1990); <u>Watkins v. United States Army</u>, <u>supra</u>; <u>Morgan v. Heckler</u>, 779 F.2d 544 (9th Cir. 1985); <u>Jablon v. United States</u>, 657 F.2d 1064, 1067 n.5 (9th Cir. 1981).

Petitioner argues that respondent should be estopped from assessing additional estate taxes on two grounds:  (1) Respondent's closing letter constituted affirmative misconduct on which petitioner relied to its detriment; and (2) respondent failed to follow the procedures for reopening a case outlined in the Internal Revenue Manual (the Manual) and closing letter.

There is no doubt that the Ogden Service Center's closing letter was erroneous.  It, however, appears from the sparse record on this point that the error occurred because an Ogden Service Center employee neglected to check the estate's

transcript which indicated an examination was underway before issuing the closing letter. Respondent never affirmatively concealed the mistake. Once the mistake was discovered, respondent immediately notified petitioner that the audit was still underway. Petitioner has failed to demonstrate how this isolated and careless act amounts to affirmative misconduct going beyond mere negligence.

As for petitioner's second argument, we do not believe that respondent violated the Manual procedures or the closing letter's description of the circumstances for reopening petitioners' case. Under section 4023.2(1) of the Manual, there are three criteria for reopening an audit. The third criterion is that an audit may be reopened where "other circumstances exist which indicate failure to reopen would be a serious administrative omission." 1 Audit, Internal Revenue Manual (CCH), sec. 4023.2(1) at 7063-4. Under section 4023.5 of the Manual, a "serious administrative omission" is defined as a closed case where failure to reopen the case could "result in serious criticism of the Service's administration of the tax laws". 1 Audit, Internal Revenue Manual (CCH), sec. 4023.5 at 7065. The closing letter stated: "we will not reopen this return unless * * * other circumstances exist which indicate that a failure to reopen would result in a serious administrative omission." The reopening letter stated that the audit was being reopened because a "serious

administrative omission" had occurred and failure to reopen the case "would result in criticism, undesirable precedent, or inconsistent treatment."

Failure to reopen the audit, herein, would mean that a potential $1,373,797 of estate tax could go uncollected. The loss of such revenue could result in criticism of the IRS' administration of the tax laws and inconsistent treatment among taxpayers. We believe that respondent complied with the Manual's procedures and the closing letter's description of circumstances for reopening an audit. Further, this Court has stated numerous times that procedural rules of this sort are "merely directory, not mandatory, 'and compliance with them is not essential to the validity of a notice of deficiency.'" Collins v. Commissioner, 61 T.C. 693, 701 (1974)(quoting Luhring v. Glotzbach, 304 F.2d 560, 563 (4th Cir. 1962)).

We are also not convinced that the traditional elements of equitable estoppel are satisfied. We doubt whether petitioner's reliance on the closing letter was reasonable. On October 10, 1995, Mr. Samuelson notified petitioner's counsel that the IRS intended to hire an appraiser to value the properties which would take at least 3 months, and Mr. Samuelson would contact petitioners' counsel when the expert was hired. On December 14, 1995, the Ogden Service Center issued the closing letter. Neither petitioner's counsel nor a representative of petitioner

contacted Mr. Samuelson to discuss the issuance of the closing letter and the inconsistencies between its issuance and the conversation between petitioner's counsel and Mr. Samuelson just 2 months earlier. We believe that a reasonable and prudent person would have inquired about these inconsistencies.

Additionally, we are skeptical as to petitioner's claim of detriment in this case. Petitioner claims that it wanted to know the precise amount of estate tax owed before formulating its plan to dispose of the Brocato properties and it relied on the closing letter in determining that amount. If petitioner had not received the closing letter, petitioner contends that it would have exercised its section 6166 election and would have waited to sell 2360 Chestnut after the property appreciated.[2]

It is not disputed that petitioner had a valid section 6166 election and could have deferred payment of its estate tax. We, however, question whether petitioner would have actually exercised its section 6166 election. Petitioner paid its estate tax liability on May 22, 1996, approximately 3 years before it was required to pay under section 6166. It is speculative whether petitioner would have continued to take advantage of the

---

[2] Petitioner later argues that it is entitled to use the concurrent sales method in determining the appropriate blockage discount because it would be too risky to hold the Brocato properties over a reasonable time period to dispose of them. This argument suggests that petitioner desired to sell each property as quickly as possible including 2360 Chestnut.

section 6166 election had it been told of the increased estate tax liability.

Petitioner also claims that the Chestnut property appreciated in value after its premature sale, and petitioner would have been able to sell it for a higher sum but for the issuance of the closing letter. Again, this involves conjecture. Petitioner has failed to demonstrate that it suffered a detriment as a result of its reliance on the closing letter.

We conclude that respondent is not equitably estopped from assessing additional estate taxes.

## II. Discounts

We must now decide the proper amounts of blockage and fractional interest discounts to apply to the Brocato properties.

On the return, petitioner applied a 20-percent blockage discount to the Brocato properties and applied an additional 20-percent fractional interest discount to the fractional interest properties. These discounts were based on the Rhoades report. On brief, petitioner continues to claim a 20-percent fractional interest discount on the fractional interest properties but concedes it is entitled only to a 12.5-percent blockage discount on eight properties (excluding 101 Capra).

In the notice of deficiency, respondent allowed a blockage discount of $116,627 (approximately 1.92 percent) on seven of the nine Brocato properties and a fractional interest discount on the

fractional interest properties based on partition costs.

For Federal estate tax purposes, property is generally included in the decedent's gross estate at its fair market value at his death.  See sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs.  Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  See United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

A determination of the fair market value of a group of items includes a consideration of how many of the items would be available for sale at any one time and the length of time necessary to liquidate the entire inventory.  See Calder v. Commissioner, 85 T.C. 713, 722-723 (1985); Rimmer v. Commissioner, T.C. Memo. 1995-215.  Where the addition of a group of similar items into the market within a short period of time depresses the price of the items, a blockage discount is appropriate.

When dealing with fractional interests in real property, courts have held that the sum of all fractional interests can be less than the whole and have used fractional interest discounts to value undivided interests.  See Harwood v. Commissioner, 82 T.C. 239, 267-268 (1984), affd. without published opinion 786

F.2d 1174 (9th Cir. 1986); Estate of Williams v. Commissioner, T.C. Memo. 1998-59; Mooneyham v. Commissioner, T.C. Memo. 1991-178; Estate of Sels v. Commissioner, T.C. Memo. 1986-501. Fractional interest discounts may be necessary to compensate a willing buyer for the lack of control, lack of marketability, illiquidity, and potential partitioning expenses associated with such interests. See Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425.

Petitioner primarily relies on an appraisal report prepared by Paul E. Talmage (Mr. Talmage) to establish the appropriate blockage and fractional interest discounts. Respondent relies on an appraisal report prepared by Karen Simons (Ms. Simons).

We have wide discretion in accepting expert testimony. See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938). We examine the expert's qualifications and compare his or her testimony with all other credible evidence in the record. We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion that we wish to adopt. See id.; Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Mr. Talmage was recognized by the Court as an expert in real estate appraisal, including blockage and fractional interest discounts. He is a member of the Appraisal Institute and has

been an appraiser since 1971.  The majority of his assignments
(80 percent) are in the San Francisco Bay area.

Ms. Simons was also recognized by the Court as an expert in
real estate appraisal.  She is a member of the Appraisal
Institute and has been appraising since 1975.  She, however, has
limited experience with blockage and fractional interest
discounts.

After a careful review of the entire record, we believe Mr.
Talmage's report best represents the fair market value of
decedent's interest in the Brocato properties; however, we do not
agree entirely with his results.

A.  Blockage Discount

1.  Mr. Talmage's Report

In determining the appropriate blockage discount, Mr.
Talmage assumed the Brocato properties would be placed on the
market contemporaneously or over a reasonably short period and
sold within the normal marketing period.  Mr. Talmage determined
that the normal marketing period for buildings with five or more
units in northern San Francisco during 1993 was 6 months.  He
also found that all of the Brocato properties except 1359 Bay
(the duplex) would compete with each other if listed
contemporaneously, thus requiring a blockage discount for eight
properties.  Mr. Talmage determined that a 12.5-percent blockage
discount was appropriate based on various factors, particularly a

comparison of the number of properties listed in the Marina District/northern San Francisco area during 1992 and 1993 and the number of Brocato properties.  Mr. Talmage gathered these market statistics from the multiple listing service (MLS) and Comps Inc. (Comps).  Mr. Talmage's report also refers to the San Francisco economy, investor pessimism, earthquake concerns, size of the Brocato properties, and potential pool of investors in determining an appropriate blockage discount.

2.  Ms. Simons' Report

Ms. Simons' report determines a blockage discount of $116,627 (approximately 1.92 percent).  Ms. Simons assumed a sale of all properties within a certain time period and used a discounted cash-flow analysis to determine her blockage discount (blockage discount model).  She chose a discount rate of 12.5 percent.

Ms. Simons determined that the normal marketing period was 4 months and the Brocato properties could reasonably be sold two at a time.  Thus, in total, Ms. Simons concluded that it would take 16 months to market successfully the Brocato properties.

Ms. Simons also found that only seven of the Brocato properties would compete in the same market; therefore, she applied the blockage discount only to these seven properties (excluding 1359 Bay and 2360 Chestnut).

When performing the present value calculations, Ms. Simons assumed two properties were marketed and sold every 4 months. Ms. Simons used an average sales price for each of the properties and discounted this price back to the date of decedent's death based on the time required to sell the properties. Because the first two properties were assumed to sell within a normal marketing period of 4 months, Ms. Simons did not discount these prices back to present value.

### 3. Appropriate Blockage Discount

The parties disagree as to the appropriate method for determining a blockage discount. Although we do not find anything inherently wrong in Ms. Simons' approach, we believe that Mr. Talmage's approach is the better determiner of the appropriate blockage discount to apply in the present case. Cf. Estate of Auker v. Commissioner, T.C. Memo. 1998-185 (wherein we adopted an approach similar to Ms. Simons' approach). Mr. Talmage's report is well reasoned and based on reliable statistical data.

We find that 6 months was a reasonable marketing period for properties in the Marina District. Not only do the MLS and Comps data support such a finding, but we believe that Ms. Simons' report also does. Ms. Simons' report concludes that it would take 3 to 4 months to list and either sell or escrow a property. Mr. Talmage's marketing period begins with the listing and ends

with the closing of the escrow.  We believe that Mr. Talmage's marketing period better represents the actual time required to close and collect the sales proceeds of a property.

We agree with Mr. Talmage's use of MLS and Comps data in determining the number of available apartment buildings in the Marina District and greater northern San Francisco area during the year at issue.  The MLS figures showed that in 1992 and 1993 there was an average of 29 listings per year in northern San Francisco (includes the Marina District).  Taking into account a 6-month normal marketing period, there were approximately 14 to 15 properties listed in northern San Francisco at any given time during 1992 and 1993.  The Comps data showed that there were only 18 listings in the Marina District during 1993.  Again, accounting for a 6-month normal marketing period, only nine properties were listed in the Marina District in 1993 at any given time.  Mr. Talmage concludes from these statistics that the addition of 8 new properties from the Brocato estate on the market in 1993 would have increased the market by at least 30 percent (4 new properties/14 properties in northern San Francisco market) and could have increased the market by 44 percent (4 new properties/9 properties in the Marina District market).

We, however, disagree with Mr. Talmage's conclusions with regard to how many of the Brocato properties would compete with each other and deserve a blockage discount.  Mr. Talmage and Ms.

Simons agree that 1359 Bay, the duplex, would not compete with the other Brocato properties.  Ms. Simons also believes that 2360 Chestnut, the 42-unit building, would not compete with the other Brocato properties.  We agree with Ms. Simons.  Based on its size and value, we believe 2360 Chestnut would appeal to a different pool of potential buyers.  The other Brocato properties would most likely be purchased by "Mom and Pop" buyers.[3]  Most likely, these buyers would not have the resources to finance such a large purchase as 2360 Chestnut, nor would they be interested in running such a large apartment complex.  We agree with respondent that only seven of the Brocato properties--25 Cervantes, 3637 Fillmore, 2395 Francisco, 15 Alhambra, 2000 Beach, 101 Capra, and 3737 Fillmore--would compete with each other and are entitled to a blockage discount.

Based on the number of properties in the same market in 1993, the San Francisco economy at that time, and the limited pool of investors, we believe that the introduction of seven new properties, 3.5 properties each 6 months, warrants an 11-percent blockage discount.

---

[3] "Mom and Pop" buyers are described by both experts as individuals purchasing a rental property with the intention of living on the premises and managing the property.

B.  Fractional Interest Discount

   1.  Mr. Talmage's Report

Mr. Talmage applied a 20-percent fractional interest discount to the fractional interest properties.[4]  Mr. Talmage examined eight comparable sales of fractional interests and the fractional interest discounts applied in each sale.  In three of the comparable sales (comparables 2, 4, 6), no fractional interest discount was applied because the buyer was acquiring a controlling interest with the purchase of the fractional interest.[5]  Comparables 1, 5, 7, and 8 consisted of fractional interests ranging from approximately 1 to 20 percent with discounts ranging from 6 to 50 percent.  Mr. Talmage adjusted comparables 1, 5, and 8 downward and comparable 7 upward to arrive at a 20-percent fractional interest discount.  In making

---

[4]  Mr. Talmage alternatively suggested that a 25-percent fractional interest discount would be appropriate due to potential conflicts among the beneficiaries of decedent's trust which might burden the income-producing capabilities of the properties.  The only potential conflict shown by the record was Thomas Brocato's (son of decedent) contemplation of forcing the sale of the fractional interest properties.  Because we determined the fractional interest discount based on a hypothetical sale of the decedent's interest, Thomas Brocato's threat of a forced sale has no impact on the fractional interest discount.  We find no additional discount is warranted based on potential family conflicts.

[5]  Comparable 3 also yielded no fractional interest discount; however, the buyer in that comparable was not acquiring control of the property.  Mr. Talmage accounts for the lack of a discount by pointing to an accommodating seller and exceptional circumstances surrounding the sale.

these adjustments, Mr. Talmage examined the size of the comparable interests, lack of a market for the interests, special circumstances surrounding their sale, and whether there was a forced sale.

### 2. Ms. Simons' Report

Ms. Simons based her fractional interest discount on the costs to partition the properties. Ms. Simons recognized that there are three methods to partition property in California: (1) Physical division; (2) sale of property and division of proceeds; and (3) partition by appraisal. See Cal. Civ. Proc. Code secs. 873.210, 873.510, 873.910 (West 1980). Ms. Simons determined 1359 Bay could be physically divided in 6 months at a cost of $20,000. Ms. Simons determined the fair market value of the interest, deducted the partition costs, and accounted for the delay associated with the physical division of the property using a discounted cash-flow analysis assuming a 6.5-percent discount rate.

Ms. Simons determined 101 Capra and 3737 Fillmore would require a partition sale and division of the proceeds. Ms. Simons determined that the partition sales would be relatively simple, cost $20,000 each, and would take approximately 6 months to complete. Ms. Simons assumed these properties would be listed in the ninth month and sold in the twelfth month under her blockage discount model and applied the blockage discount model

discount rate of 12.5 percent to the partition proceeds less the partition costs of these properties.[6]

### 3. Conclusion

The parties' arguments center upon the correct method for determining a fractional interest discount. Courts have often looked at costs to partition in determining an appropriate fractional interest discount. Courts, however, consider other factors, such as the historical difficulty in selling these interests and lack of control. See Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425.

Given the limited scope of Ms. Simons' analysis, we find Mr. Talmage's report to be more persuasive in determining the fractional interest discount. We conclude that a 20-percent fractional interest discount is appropriate.

To the extent not herein discussed, we have considered the parties' other arguments and found them to be meritless. To reflect the foregoing,

Decision will be entered under Rule 155.

---

[6] It is unclear why Ms. Simons chose to use the 12.5-percent discount rate utilized in her blockage discount model as opposed to the 6.5-percent discount rate used for 101 Capra.