T.C. Memo. 1997-145


UNITED STATES TAX COURT


TERENCE M. BENNETT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21163-94.          Filed March 19, 1997.


<u>Peter D. Anderson</u>, <u>Steven M. Burke</u>, and <u>Kelly A. Ayotte</u>, for petitioner.

<u>Ronald F. Hood</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined a deficiency of $778,866 in petitioner's 1988 Federal income tax.  Respondent further

determined additions to tax pursuant to sections 6653(a)(1)[1] and 6661 in the amounts of $38,943 and $194,717, respectively.

The issues for decision are: (1) Whether respondent fraudulently induced petitioner to execute a Form 872 (Consent to Extend the Time to Assess Tax) and is therefore estopped from relying upon petitioner's consent to extend the period of limitations; (2) whether the presumption of correctness should attach to respondent's determination of unreported income; (3) whether petitioner was the owner of five antique automobiles and realized gain on their sale for a price of $3 million in 1988; (4) if we find that petitioner owned the automobiles in issue, whether he is entitled to bases in three of the automobiles in excess of that determined by respondent; (5) whether petitioner is liable for an addition to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1); and (6) whether petitioner is liable for an addition to tax for a substantial understatement of income tax pursuant to section 6661.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulations of facts

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

are incorporated herein by this reference.  Petitioner resided in Rochester, New Hampshire, at the time he filed his petition.

Petitioner is a physician who received his medical degree from Harvard Medical School in 1964.  Petitioner and his former wife Linda Bennett (Linda) were married on June 1, 1964.

In 1973, petitioner moved to Saudi Arabia where he worked as a physician for Raytheon.  From 1974 to 1981, petitioner operated a medical clinic in Jeddah, Saudi Arabia.  While in Saudi Arabia, petitioner became acquainted with Abdul Aziz Ben-Jabr (Abdul), whom he treated for hepatitis, and other members of the Ben-Jabr family.  Abdul died in late 1977 or early 1978.

Petitioner's Acquisition and Sale of the Automobiles in Issue

Petitioner has collected antique automobiles since his youth.  At the time he moved to Saudi Arabia, petitioner had a collection of approximately 60 antique automobiles, which he stored in Gloucester and Rowley, Massachusetts.  Petitioner continued to pursue this hobby while in Saudi Arabia.

On or about August 18, 1978, petitioner purchased a 1937 Mercedes Benz 540-K, Serial No. 130941, from Earl Blakely for $60,000.  The bill of sale dated August 18, 1978, listed petitioner as the buyer of the automobile.[2]  In November 1978,

---

[2]Par. 6 of the stipulation of facts lists the automobile as a 1937 Mercedes 540-K.  The bill of sale indicates that the automobile was a 1936 Mercedes 540-K.  We assume this to be an
(continued...)

petitioner purchased a 1929 Bentley Tourer Speed Six, Serial No. K2683, from Herbert A. Schoenfeld, Sr., for $40,000. In a letter dated April 16, 1979, Mr. Schoenfeld released title and interest in the automobile to petitioner.

During late 1979 or early 1980, petitioner purchased a 1936 500K Mercedes Roadster, Serial No. 130857, from Carlisle L. Marshall for $100,000. Mr. Marshall transferred the automobile's Motor Vehicle Certificate of Title (State of Florida) to petitioner on or about January 3, 1980.[3]

At some point during the late 1970's or early 1980's, petitioner also purchased a 1932 Mayback Zepplin, Serial No. 1388, and a Lagonda LG45 Repead, Serial No. 12226. The amount petitioner paid for each of these automobiles is unknown.

Petitioner retained possession and control over the five previously mentioned automobiles until their sale in 1988. In a letter dated June 5, 1988, petitioner offered to sell these five automobiles to Nicholas Harley for a total sales price of $3 million. Pursuant to petitioner's instructions, on or about July 6, 1988, Mr. Harley wire transferred $3 million from the Gota

---

[2](...continued) error and will follow the year as indicated in the stipulation of the parties.

[3]Par. 5 of the stipulation of facts lists the automobile as a 1936 500K Mercedes Roadster. The Motor Vehicle Certificate of Title (State of Florida) indicates that this automobile was a 1937 model. We assume this to be an error and will follow the year indicated in the stipulation of the parties.

Bank in Stockholm, Sweden, to Bank Julius Baer & Co. (Julius Baer) of London, England. The funds were credited to Julius Baer's account (No. 04-056-925) at Banker's Trust Co. in New York, and were available on or about July 7, 1988.

On or about July 8, 1988, petitioner sold the five automobiles for $3 million to Mr. Harley who was acting on behalf of Winkeleigh Garage, Ltd., of London, England.[4] Petitioner signed the bill of sale for each automobile, thereby covenanting to the buyer that he was the lawful owner.[5] Mr. Harley subsequently wrote the sale price for each automobile on the bill of sale based upon his opinion of the automobile's market value.[6] Petitioner also transferred to Mr. Harley the certificate of title for each automobile except the Lagonda LG45 Repead.

On July 18, 1988, $453,375 was wired from the Julius Baer account (No. 04-056-925) at Banker's Trust Co. in New York, to

---

[4]At the time of the transaction, Mr. Harley was a director and major shareholder of Winkeleigh Garage, Ltd.

[5]Petitioner never represented to Mr. Harley that he was not the owner of the automobiles.

[6]Mr. Harley attributed the following sales prices to the automobiles:

| Automobile | Sale Price |
| --- | --- |
| 1937 Mercedes 540-K | $550,000 |
| 1929 Bentley Tourer | 250,000 |
| 1936 500K Mercedes | 1,500,000 |
| 1932 Mayback Zepplin | 550,000 |
| Lagonda LG45 Repead | 150,000 |

the Indian Head Bank in Portsmouth, New Hampshire, in satisfaction of an outstanding mortgage on property that petitioner owned in Maine.

## Petitioner's Divorce

Petitioner and Linda Bennett began to live apart sometime around November 1987. In the spring of 1988, petitioner compiled, in contemplation of divorce, a three-page list of the couple's marital assets and their estimated values. Included on this list were the five automobiles later sold to Mr. Harley on or about July 8, 1988.[7] On July 9, 1988, petitioner informed Linda that he had sold these automobiles in order to finance the couple's divorce settlement. Linda then wrote "sold" beside the listing for each automobile.

On or about September 7, 1988, petitioner paid $2.5 million to Linda in connection with the settlement of their divorce. This money was paid by a check dated September 7, 1988, drawn on the account of Banque de l'Etat de Fribourg at the New York Branch of Credit Lyonnais Bank.

On September 15, 1988, petitioner filed with the Superior Court of the State of New Hampshire a document entitled "Support

---

[7]The stipulation of facts and exhibits contain slight discrepancies regarding the model year of petitioner's automobiles. However, there is no question that the automobiles sold to Mr. Harley were the same automobiles that were included on the list of marital assets that petitioner and Linda Bennett compiled in contemplation of their divorce.

Affidavit of Terry M. Bennett", which included a listing of petitioner's outstanding bills and balances due thereon. Petitioner listed an outstanding mortgage of $865,000. He did not list any liabilities to the Ben-Jabr family on his support affidavit.

Petitioner and Linda Bennett entered a permanent stipulation of divorce with the Superior Court of the State of New Hampshire on September 16, 1988.

Petitioner's 1988 Federal Income Tax Return

On his 1988 return, petitioner did not attach a Schedule D or otherwise report any capital gain from the sale of any automobiles. Petitioner concedes that he failed to report income for 1988 of $10,000 and $6,500 from the sale of a Bugatti and a Lotus automobile, respectively. The sale of these automobiles is unrelated to the five automobiles sold to Mr. Harley on July 8, 1988.

Charles W. Tilton, Jr., is a licensed public accountant in Hampton, New Hampshire, with over 25 years of experience. Mr. Tilton prepared petitioner's Federal income tax returns for the taxable years 1985 through 1988.

On January 25, 1993, petitioner delivered a letter to Mr. Tilton that petitioner had written for Mr. Tilton's signature regarding the sale of the automobiles in 1988. The letter, which petitioner wanted Mr. Tilton to adopt as his own, stated:

1.  Dr. Bennett told me in July or August of 1988 that he had sold five antique automobiles for the sum of Three Million Dollars.
This was not surprising.  Previously in my association with Dr. Bennett he had sold other cars and told me of the details, including the cars sold in 1987 to pay off the 1987 assessment on his 1985 return.
There was no new behaviour[sic] here, and no surprise.  Only the sum of money was in any way unusual.

2.  Dr. Bennett said that the cars belonged to the estate of a deceased patient from Saudi Arabia.  (Abdul Aziz Ben Jabr)

3.  Dr. Bennett said that the cars had been sold to a European buyer through some kind of an English broker, and that the money had been paid into the control of the Ben Jabr family at their bank, that he had not handled any of the money at the time of the sale.

4.  Dr. Bennett said that he had arranged to borrow almost all of the money back from the Ben Jabrs to finance his divorce and pay off a mortgage at the Indian Head Bank.  These transfers were effected by the Saudis via a Bank Check, and a bank to bank direct transfer, all completely aboveboard.  He got divorced, and the Bank got their money.

5.  I told Dr. Bennett that, in my opinion, this was not a taxable transaction.

6.  Accordingly it was not reported on his 1988 tax return.

7.  Dr. Bennett discussed this sale/loan with me at the time it occurred.  He was up front about the transaction, and truthful, to the best of my knowledge.

There is no mystery here.  This is not a taxable transaction, to the best of my knowledge.

8.  That the IRS is trying to argue that in 1993 the value of Dr. Bennett's holdings is not enough to repay the loans is a lame argument.

9.  In 1988 Dr. Bennett's real estate holdings alone were worth several times the amount borrowed, and he

owned cars, art, etc with great value in that boom time economy.

Dr. Bennett still owns a lot of stuff (real estate, cars, an antique business, etc etc.)

I'm sure that Dr. Bennett plans to repay the loan as soon as the economy allows him to convert his assets without losing his shirt. He says he will repay the loan, and I believe him.

10. Moreover, it is my understanding that the Saudis are not pressing this matter, and have corroborated all details of Dr. Bennett's story. Is this correct? If so what is the problem?

Best Regards,


Charles Tilton.


Petitioner told Mr. Tilton to retype the letter on Mr. Tilton's letterhead, sign it, and send it to Michael J. Asselin. Mr. Asselin was petitioner's representative and held a valid Form 2848 (Power of Attorney and Declaration of Representative). Mr. Tilton refused to carry out these instructions. On February 17, 1993, Mr. Tilton wrote to Mr. Asselin concerning his recollection of petitioner's explanation of the automobile sales in 1988. In his letter, Mr. Tilton stated:

> At the beginning of 1989 I stopped at Terrys[sic] office to pick up his 1988 tax information. He told me that his wife Linda had been paid off and the divorce was final. He told me he had sold an auto collection belonging to a friend of his and this person was letting him borrow the money to pay off Linda and some other bills. I asked him if he had received a commission on the sale and was any part of the payment to Linda for alimony. He said there was no commission or alimony paid.

A few weeks later when I dropped off the completed tax
return he said he was concerned that the IRS would
wonder where he got the money to pay Linda.  He wanted
me to attach a note to his tax return telling the IRS
that the money paid to Linda was not taxable.  I told
Terry that I could not write a meaningful letter to the
IRS about the auto sales.  I did not know the cars
sold, date of sale, who the buyers and sellers were,
social security numbers.  I suggested he write the
letter himself or else have the Lawyer handling the
sale write a letter for him.

Petitioner's 1988 return as filed contained no attachments or
other references to any automobile sales or loans used to pay
amounts due to Linda pursuant to the divorce.

Additional Facts

Although the exact date on which respondent began her civil
examination of petitioner's 1988 Federal income tax return is
unknown, the investigation appears to have been underway by the
beginning of 1990.  From approximately May 1990 to September
1991, respondent also conducted a criminal investigation of
petitioner's 1988 Federal income tax return.  The investigation
did not result in a recommendation of criminal prosecution.

On February 16, 1993, petitioner executed a Form 872[8]
extending the period of limitations for assessment of
petitioner's 1988 income tax to June 30, 1994.  In July or August

---

[8]Petitioner executed a total of three Forms 872 in this
case.  On Feb. 12, 1992, petitioner executed his first Form 872,
which extended the period of limitations to June 30, 1993.  In
addition, on June 9, 1994, petitioner executed his third Form
872, extending the period of limitations to Aug. 31, 1994.

1993, Revenue Agent Rigney received information that petitioner allegedly had unreported income from an antique automobile sale in 1987. At this time, Revenue Agent Rigney believed that a re-referral of petitioner's case to respondent's Criminal Investigation Division (CID) was necessary, because there appeared to be a 2-year pattern of omitted income on petitioner's part. Respondent conducted a second criminal investigation from October 1993 to April 1994, which also did not result in a recommendation of criminal prosecution.

In September 1991, petitioner auctioned off a substantial portion of his antique car collection and donated approximately $4 million in proceeds to the Harvard Medical School, which established a scholarship trust fund. Petitioner reserved a lifetime income equal to 5 percent of the face value of the trust.

OPINION

Before reaching the substantive issues in this case, we must dispose of two preliminary issues raised by petitioner. First, petitioner argues that Revenue Agent Rigney fraudulently induced him into signing a Form 872 on February 16, 1993, extending the period of limitations. Petitioner alleges that Revenue Agent Rigney induced Mr. Asselin to get petitioner to sign the Form 872 with false representations that an extension was necessary to conclude respondent's civil investigation. Petitioner contends

that respondent was, in fact, attempting to obtain information for her second criminal investigation of his 1988 taxable year under the guise of a civil investigation.

Section 6501(a) generally requires the assessment of income taxes within 3 years after the filing of the taxpayer's return. However, the taxpayer and Secretary may consent in writing to extend the period of limitations for an assessment. See sec. 6501(c)(4).[9] Petitioner maintains that respondent should be estopped from relying upon his consent to extend the period of limitations in this case. It is well settled that the doctrine of estoppel should be applied against the Government "with utmost caution and restraint." Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977). Courts have set forth several conditions which must be satisfied before estoppel will be applied. See, e.g., Lignos v. United States, 439 F.2d 1365, 1367-1368 (2d Cir. 1971); Kronish v. Commissioner, 90 T.C. 684, 695 & n.10 (1988); Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810

---

[9]Sec. 6501(c)(4) provides:

   (4) Extension by agreement.--Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

F.2d 209 (D.C. Cir. 1987). Two of these requirements are: (1) The existence of a false representation or wrongful misleading silence by the party against whom the doctrine is applied; and (2) the party claiming the benefits of estoppel must be adversely affected by the acts or statements of the other party. Kronish v. Commissioner, supra at 695 & n.10; Estate of Emerson v. Commissioner, supra at 617-618.[10]

The record contains no evidence of either requirement. First, Revenue Agent Rigney did not mislead petitioner into executing the Form 872. Revenue Agent Rigney testified that he told Mr. Asselin in February 1993 that the period of limitations was scheduled to expire on June 30, 1993, and he still had additional work to complete with respect to petitioner's civil investigation. Without the execution of a Form 872 extending the period of limitations, respondent would have issued a notice of deficiency, and petitioner would have lost the opportunity for a settlement conference with respondent's Appeals Office. At this time, Revenue Agent Rigney had no intention to refer petitioner's case back to respondent's CID. Indeed, Revenue Agent Rigney testified that it was not until July or August 1993 that he

_____

[10]The remaining requirements are: (1) The error must be in a statement of fact and not in an opinion or statement of law; (2) the party claiming the benefits of estoppel must be ignorant of the true facts; and (3) the party claiming the benefit of estoppel must reasonably rely on the acts or statements of the one against whom estoppel is claimed. Kronish v. Commissioner, 90 T.C. 684, 695 n.10 (1988).

received information concerning petitioner's 1987 taxable year and the possibility of omitted income from an antique automobile sale in that year. It was this information, obtained after execution of the relevant Form 872, that caused Revenue Agent Rigney to believe that a referral of petitioner's case to CID was appropriate, because petitioner then appeared to have a 2-year pattern of omitted income.

Concerning the second requirement, even if petitioner had been affirmatively misled, he still has not shown the existence of any detrimental reliance on his part. Kronish v. Commissioner, supra at 695 & n.10. Petitioner signed the Form 872 expecting respondent to use this waiver for civil purposes, and that is all she ever used it for. No criminal prosecution of petitioner has ever resulted from the investigation by the CID. Thus, we conclude that Mr. Asselin's execution of the Form 872 on February 16, 1993, was valid, and respondent is not estopped from relying on it.

The second issue for decision involves the presumption of correctness. Petitioner argues that the presumption of correctness should not attach to respondent's deficiency notice in this case, because respondent did not present sufficient evidence linking petitioner to the alleged unreported income. When a taxpayer contests a tax that has been determined by the Commissioner, the Commissioner's determination is generally presumed correct, unless the taxpayer produces evidence

establishing that the determination is arbitrary and erroneous. See Helvering v. Taylor, 293 U.S. 507, 515 (1935). Several Courts of Appeals recognize an exception to this general rule where the Commissioner determines that the taxpayer received income that was not reported on the taxpayer's return. In these instances, the Commissioner must first present "'some predicate evidence connecting the taxpayer to the charged activity.'" Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986) (quoting Gerardo v. Commissioner, 552 F.2d 549, 554 (3d Cir. 1977)), vacating and remanding T.C. Memo. 1985-101.[11]

In any event, respondent's notice of deficiency here is entitled to the traditional presumption of correctness. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent has clearly produced sufficient "predicate evidence" linking petitioner to the sale proceeds in this case. See Anastasato v. Commissioner, supra at 887. Respondent produced evidence that: (1) Petitioner had possession and control over the five automobiles in issue from the date of acquisition until their sale to Mr. Harley in July 1988; (2) petitioner provided Mr. Harley with bills of sale listing himself as the owner of the

---

[11]The Court of Appeals for the First Circuit (to which this case is appealable) has held that "in a deficiency or refund suit, the burdens of going forward and of ultimate persuasion are always on the taxpayer and never shift to the Commissioner." United States v. Rexach, 482 F.2d 10, 17 (1st Cir. 1973); see also Delaney v. Commissioner, 99 F.3d 20, 23 (1st Cir. 1996), affg. T.C. Memo. 1995-378.

automobiles; (3) petitioner provided Mr. Harley with certificates of title to four of the automobiles; (4) Mr. Harley was acting at the express direction of petitioner when he wired the $3 million in sale proceeds to the Julius Baer account at Banker's Trust in New York; (5) approximately 10 days after the sale proceeds were deposited into the Julius Baer account at Banker's Trust, $453,375 was wired from this account to the Indian Head Bank in Portsmouth, New Hampshire, in satisfaction of an outstanding mortgage on property owned by petitioner; (6) approximately 2 months later, petitioner provided his wife with $2.5 million in satisfaction of his divorce settlement obligation; and (7) in connection with the divorce, petitioner had included the automobiles in question on a three-page list that he compiled of the couple's marital assets.

The principal issue for decision is whether petitioner owned the automobiles in issue and, therefore, realized gain on their sale on or about July 8, 1988. Petitioner argues that he sold the automobiles on behalf of the late Abdul Aziz Ben-Jabr, and then borrowed a total of $2,953,000 from the Ben-Jabr family to satisfy an outstanding $453,375 mortgage on property he owned in Maine, as well as a $2.5 million divorce settlement obligation. Respondent, on the other hand, contends that petitioner was the owner of the five automobiles in question and used almost all the sale proceeds to satisfy the above obligations.

The record contains persuasive objective evidence indicating petitioner's ownership of the automobiles. For instance, the bill of sale that petitioner received on his acquisition of the 1937 Mercedes Benz 540-K, Serial No. 130941, listed petitioner as the buyer of the automobile. Mr. Schoenfeld, who sold petitioner the 1929 Bentley Tourer Speed Six, Serial No. K2683, released title and interest in that automobile to petitioner in a letter dated April 16, 1979; and Mr. Marshall, who sold petitioner the 1936 500K Mercedes Roadster, Serial No. 130857, transferred the certificate of title to that automobile to petitioner as well. Moreover, petitioner had possession and control over all five automobiles in question from the time he acquired them until they were sold in 1988.

When petitioner sold the automobiles in July 1988, he personally signed the bill of sale for each automobile, covenanting to the buyer that he was the lawful owner. Petitioner also transferred certificates of title for four of the automobiles to Mr. Harley.

Of even greater significance is the three-page list of the marital assets of petitioner and Linda Bennett, which petitioner prepared in the spring of 1988 in contemplation of divorce. Included on this list were the five automobiles sold by petitioner in July of that year and their estimated market values. Petitioner's inclusion of these automobiles on his list of marital assets was contrary to his pecuniary interest, as the

list was used in determining petitioner's divorce settlement obligation. We simply do not believe that petitioner would have included these automobiles on the list if he did not, in fact, own them. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 512 (1991) ("we assume 'that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.'") (citations omitted); cf. Fed. R. Evid. 804(b)(3) (allowing the admission of statements against a declarant's interest as an exception to the rule against hearsay).

The testimony of former New Hampshire State Police Officer Donald Gates further confirms our conclusion that petitioner owned the automobiles in question. Mr. Gates had been assigned to investigate a robbery at petitioner's house on or around April 3, 1990, and a fire approximately 2 weeks later at a location where petitioner stored automobiles.[12] Through the course of his investigation, Mr. Gates learned that petitioner needed to sell several of his antique automobiles in order to finance his divorce settlement with Linda Bennett. Given the prior robbery and the fire, Mr. Gates inquired about these automobiles and the status of the sale in order to determine whether petitioner might be the potential target of future crimes. When asked about his

---

[12]Neither occurrence is relevant to this case.

discussions with petitioner regarding the sale of these

automobiles, Mr. Gates explained as follows:

> I was asking about the mechanics of the transaction,
> where did it go and how did it have to go, and I was
> told [by petitioner] that the cars were delivered and
> the transaction took place outside the United States.
> My obvious question is why does it need to be that
> confusing, why does it have to be that complicated.
> * * *
>
> Q:  What did Mr. Bennett say?
>
> A:  He said he did not want to--he wanted to avoid
> paying the taxes.  He didn't want to pay any more money
> to the IRS than he had to pay.  * * *
>
> Q:  Did he[petitioner] say anything with respect to the
> money vis-a-vis overseas banks?
>
> A:  I recall the conversation about the transaction
> taking place outside of the country and the cars being
> delivered outside of the country and everything was
> done outside of the country.
>
> Q:  Including the money.
>
> A:  Including the money.
>
> Q:  And the money was taken care of outside the United
> States, according to Dr. Bennett, for what purpose?
>
> A:  So that he would not have to pay IRS any more taxes
> than he had to pay them.

Clearly, any potential income tax consequences from the sale of

the automobiles should have been irrelevant to petitioner if he

was not the owner of the automobiles.

Petitioner's story that he purchased the five automobiles in

question for his good friend Abdul Aziz Ben-Jabr is also

inconsistent with the fact that three of the automobiles were

purchased after Abdul's death. Abdul died in late 1977 or early 1978. Petitioner purchased the 1937 Mercedes Benz 540-K, Serial No. 130941, on or about August 18, 1978; the 1929 Bentley Tourer Speed Six, Serial No. K2683, in November 1978; and the 1936 500K Mercedes Roadster, Serial No. 130857, in late 1979 or early 1980. In an attempt to explain this, petitioner testified that the Ben-Jabr family did not notify him of Abdul's death until late 1979 or early 1980. Petitioner also testified that Abdul had established an account in Saudi Arabia from which petitioner could draw funds to purchase automobiles, and petitioner did not need to consult with Abdul before making a purchase. Petitioner, who referred to himself and Abdul as "kindred spirits", lived in Saudi Arabia from 1973 through 1981. During this time, he became acquainted with Abdul's younger brother, Fallah, as well as other members of the Ben-Jabr family. Accepting the portion of petitioner's story about his friendship with Abdul and the Ben-Jabr family, it is difficult to believe that petitioner did not learn of Abdul's death for approximately 2 years, during which period he continued to purchase expensive automobiles for Abdul with funds from Abdul's Saudi account.[13]

---

[13]As an additional indication of petitioner's lack of credibility, we note his execution of a settlement agreement on Feb. 10, 1995, with the New Hampshire Board of Registration in Medicine, in which petitioner admitted to two separate instances of dishonest conduct and was fined $1,000.

We also reject petitioner's contention that he received a loan totaling $2,953,000 from the Ben-Jabr family in 1988 to satisfy a mortgage on property he owned in Maine and to satisfy his divorce settlement obligation. The record in this case contains no credible evidence of the existence of a loan. For instance, there is no evidence of any note, written loan agreement, fixed payment schedule, request for collateral, interest charge, demand for repayment,[14] or reflection of the transaction as a loan in the parties' records. See Frierdich v. Commissioner, 925 F.2d 180, 182 (7th Cir. 1991), affg. T.C. Memo. 1989-393; Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. T.C. Memo. 1983-98.

---

[14]Petitioner argues that he repaid approximately $1.2 million of the alleged loan with insurance proceeds that he received as a result of a fire that destroyed his house in 1993. Petitioner contends that he transferred funds to an account held by the Estate of Abdul Aziz Ben-Jabr at the Credit Lyonnais Bank in Switzerland. In support of his position, petitioner relies upon the following evidence of wire transfers from the Plaistow Bank & Trust Co. (Plaistow) (account number 02120186) in Plaistow, New Hampshire. One wire transfer in the amount of $700,000 was dated Nov. 1, 1993, and stated: "wire transfer to Estate of AA Ben Jabr, plus fee" A second wire transfer in the amount of $300,000 was dated Apr. 11, 1994, and stated: "wire transfer to Credit Lyonnais (Schweiz) AG Zuerich-Estate A.A. Ben Jabr". The third document is a wire request form in the amount of $225,000 and dated Mar. 3, 1995. This form stated that the transfer was to be made to an account named "Estate of A.A. Ben Jabr" (account number 08-05866.1). However, this evidence does not constitute proof of a loan repayment. Instead, it only shows that, at most, petitioner transferred approximately $1.2 million to an account that was created in the name of the Estate of Abdul Aziz Ben-Jabr. Indeed, although they had ample opportunity to do so, neither petitioner nor Fallah Ben-Jabr presented any documentary evidence establishing that the Ben-Jabr family had an account at Credit Lyonnais.

In connection with his divorce, petitioner filed a document entitled "Support Affidavit" with the Superior Court of the State of New Hampshire. Petitioner listed an outstanding mortgage of $865,000 on this affidavit. He did not include any debt that was outstanding to any member of the Ben-Jabr family. Petitioner filed the document on September 15, 1988, which would have been after petitioner's receipt of the alleged loan proceeds. The following day, petitioner and Linda Bennett entered a permanent stipulation of divorce agreement with the court, which recounted petitioner's obligation to pay Linda $2.5 million in connection therewith. Assuming the loan existed, it clearly would have been in petitioner's best interest to include a $2,953,000 loan obligation as an expense on his support affidavit.

Finally, we note that the testimony of petitioner's principal witness, Fallah Ben-Jabr, the brother of Abdul Aziz Ben-Jabr, was unreliable, and we decline to place any weight on it. For instance, when asked on direct examination if he knew whether petitioner and Abdul had any financial arrangement with respect to petitioner's alleged acquisition of the automobiles for Abdul, Fallah could only testify that "I believe so, yes." When questioned about it further, Fallah responded: "The details I cannot inform you." In addition, when questioned on cross-examination regarding his knowledge of the sale of the automobiles in 1988, Fallah testified that he had no personal knowledge of the transaction or what actually happened to the

proceeds from the sale. Furthermore, Fallah testified that he lacked any firsthand knowledge of any loan repayments by petitioner. When asked, for example, if he had any knowledge as to whether petitioner ever wired funds to any accounts controlled by the Ben-Jabr family in repayment of the purported loan, Fallah testified: "It was done during the life of my dad and he was the person responsible for it. * * * My dad was alive when some things were happening and that is all I know."

Having found that petitioner owned the automobiles in issue, we must now consider petitioner's alternative argument that respondent erroneously computed the cost bases of three of the automobiles when calculating petitioner's gain. In particular, petitioner argues that his cost bases in the 1932 Mayback Zepplin, Serial No. 1388, and Lagonda LG-45 Repead, Serial No. 12226, were $450,000 and $80,000, respectively. In the notice of deficiency, respondent determined a zero basis for each automobile, because petitioner had failed to provide documentation of his actual cost. In addition, petitioner contends that he had a $335,000 basis in the 1936 500K Mercedes Roadster, Serial No. 130857. Respondent determined that petitioner's cost basis in this automobile was $100,000, based on information provided from the seller.

Section 1012 provides that a taxpayer generally has a basis in property equal to its cost. Petitioner bears the burden of demonstrating that he is entitled to a basis in the automobiles

in excess of that determined by respondent. Rule 142(a); <u>Burnet v. Houston</u>, 283 U.S. 223, 227-228 (1931). Petitioner has not presented any documentation to support his alleged bases in the automobiles. Indeed, all petitioner offers in support of his position is his self-serving and totally uncorroborated testimony, which this Court is not required to accept. <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

Petitioner's argument is also inconsistent with a previous statement made by his representative. In a letter to IRS Special Agent James P. John dated February 20, 1991, Mr. Asselin provided petitioner's answers to a series of questions regarding the automobiles in issue. In response to a question concerning the acquisition of these automobiles, Mr. Asselin wrote:

> Dr. Bennett and Mr. [Abdul] Aziz [Ben-Jabr] were never in a partnership to acquire antique cars. Mr. Aziz purchased the cars on his own and had them sent to Dr. Bennett's home for storage. Dr. Bennett's best estimate is that Mr. Aziz acquired the cars during the period of 1974 through 1976. <u>He does not know the cost of the cars, since they were purchased by Mr. Aziz, or from whom they were purchased.</u> [Emphasis added]

Suffice it to say, this statement contradicts petitioner's current argument regarding his bases in several of the automobiles. Based on the record before us, we also decline to attempt any estimate of the cost bases for the two automobiles for which respondent has determined a zero basis, as there is no reasonable evidentiary basis upon which to do so. See <u>Vanicek v.</u>

Commissioner, 85 T.C. 731, 743 (1985).  Petitioner has not shown that he is entitled to a basis in any of the automobiles in issue in excess of that determined by respondent.

Respondent also determined that petitioner is liable for an addition to tax for negligence or intentional disregard of rules or regulations.  Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the entire underpayment if any part of the underpayment is due to negligence.  Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment that is due to negligence.  This Court has defined negligence as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  McGee v. Commissioner, 979 F.2d 66, 71 (5th Cir. 1992), affg. T.C. Memo. 1991-510; Neely v. Commissioner, 85 T.C. 934, 947 (1985).

We have declined to sustain additions to tax for negligence where taxpayers have relied reasonably and in good faith on the advice of tax experts.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Weis v. Commissioner, 94 T.C. 473, 487 (1990).  To demonstrate such good faith reliance, taxpayers must establish that they supplied their return preparer with all necessary information, and the incorrect return was a result of the preparer's mistakes.  Weis v. Commissioner, supra at 487; Pessin v. Commissioner, 59 T.C. 473, 489 (1972).  Respondent's

determination is presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

In the instant case, petitioner argues that he informed his return preparer, Mr. Tilton, of the sale of the automobiles on behalf of the Ben-Jabr family and the loans he received in 1988. Petitioner contends that Mr. Tilton advised him that the receipt of the loan proceeds was not taxable. Petitioner claims that his alleged reliance on Mr. Tilton's advice was reasonable, and he acted in good faith in not including the proceeds from the sale of the automobiles in his gross income for 1988.

However, we have already found that the five automobiles in issue belonged to petitioner. The information that petitioner allegedly gave to Mr. Tilton was not accurate, and, therefore, any advice based on this inaccurate information cannot be relied upon by petitioner to shield him from the addition to tax for negligence. We also note that petitioner failed to report gain on his 1988 return from the sale of two additional automobiles which he admittedly owned. Petitioner has failed to present any credible evidence demonstrating that he was not negligent, and, therefore, we sustain the addition to tax.

Finally, respondent determined that petitioner is liable for an addition to tax for substantial understatement of income tax. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to such

understatement.  <u>Pallottini v. Commissioner</u>, 90 T.C. 498, 503 (1988).  An understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6661(b)(1)(A).  This amount may be reduced, however, if the taxpayer shows that there was substantial authority for his treatment of an item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed on the return or in a separate statement attached to the return.  Sec. 6661(b)(2)(B).  Substantial authority exists only if the weight of the authorities supporting the treatment of an item is substantial in relation to the weight of authorities supporting contrary positions.  Sec. 1.6661-3(b)(1), Income Tax Regs.   Petitioner bears the burden of demonstrating that he had substantial authority for his position.  Rule 142(a); <u>King's Court Mobile Home Park, Inc. v. Commissioner</u>, 98 T.C. 511, 517 (1992).

We have already rejected petitioner's explanation for his failure to report the sale of the automobiles on his 1988 return, and petitioner has failed to offer any other reason for relieving him of the section 6661 addition to tax.  Since all of the requirements for imposition of the section 6661 addition to tax have been satisfied, we sustain respondent's determination.

<u>Decision will be entered</u>

<u>for respondent</u>.