T.C. Memo. 2006-112

UNITED STATES TAX COURT

HUGH G. AND NORMA J. KING, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10334-03.               Filed May 31, 2006.

<u>Joe Alfred Izen, Jr.</u>, for petitioners.

<u>Anne W. Durning</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies and
penalties with respect to petitioners' Federal income tax as
follows:

| Year | Deficiency | Sec. 6662 Penalty |
|------|-----------|-------------------|
| 1995 | $119,377 | $23,875 |
| 1996 | 68,663 | 13,733 |
| 1997 | 4,849 | 970 |
| 1998 | 14,382 | [1]2,876 |

[1] Respondent concedes that petitioners are not liable for the accuracy-related penalty for 1998.

After concessions, we must decide:

1.  Whether the notice of deficiency was sent timely.  We hold that it was.

2.  Whether petitioners had income in the amounts that respondent determined for 1995-97.  We hold that they did.

3.  Whether petitioners had larger costs of goods sold than respondent determined.  We hold that they did not.

4.  Whether petitioners may deduct larger amounts for depreciation and other expenses than respondent determined.  We hold that they may to the extent provided herein.

5.  Whether petitioners may deduct soil or water conservation expenses under section 175.[1]  We hold that they may not.

6.  Whether petitioners are liable for the accuracy-related penalty under section 6662 for 1995-97.  We hold that they are.

---

[1]  Unless otherwise specified, section references are to the Internal Revenue Code as amended.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Hugh G. King (Mr. King) and his wife, Norma J. King (Mrs. King), resided in Dothan, Alabama, when the petition was filed.

A.  Petitioners' Early Years

Petitioners grew up on farms and are high school graduates. Mr. King managed his family's farm from 1939 to 1942 and served in the Air Force from 1942 to 1946.

B.  Petitioners' Income-Producing Activities

Mr. King entered the construction and sand and gravel businesses around 1965. Petitioners bought an appliance store around 1966, discussed below in paragraph C. In 1978, Mr. King inherited a 250-acre farm, 47 acres of which were cultivated. The rest was forested. A sharecropper farmed the cultivated land.

Mr. King bought more land after 1978. Petitioners owned 537 acres of land in 1995, including 230 acres of cropland. Petitioners owned 682 acres of land in 1996-98, of which 342 acres was cropland. They sold sand mined from their land and grew timber during the years in issue.

During 1995-98, Mr. King received a peanut quota from the U.S. Department of Agriculture based on production in past years from his farm. The peanut quota allowed him to sell a specified amount of peanuts (quota peanuts) for about $600 per ton during

the years in issue. During those years, peanut farmers sold peanuts produced in excess of the peanut quota (nonquota peanuts) for about $300 a ton.

Petitioners rented the cropland to Shane Roselius in 1995, to George Roselius in 1996 and 1997, and to Brian Watkins in 1998. Petitioners leased the land to Shane and George Roselius (the Roseliuses) for $40 per acre and 14 cents per pound for the peanut quota.[2] Under the lease, the Roseliuses could keep the proceeds from the sale of peanuts they produced in excess of the peanut quota. Petitioners received lease income of about $30,000 in 1995.

Under the lease, the Roseliuses were required to: (1) Pay rent each year in advance by January 15; (2) plant a cover crop within 20 days after the peanuts were harvested; (3) maintain all ditches and terraces; and (4) fertilize the land.

A storm in 1994 destroyed the roof of petitioners' house, left a foot of water in it, and flooded parts of the farm. The Federal Government declared the area in which the farm was located to be a disaster area. Petitioners received assistance to repair the land.

Mr. King spent an amount of time not specified in the record working on the farm during the years in issue. He plowed

---

[2] The record does not include lease terms for Brian Watkins.

terraces, planted cover crops, and cleared ditches to maintain the land.

C.  King's Appliances

Petitioners bought an appliance store in Jacksonville, Florida, around 1966, which they named King's Appliances. King's Appliances sold appliances and furniture. Petitioners moved King's Appliances to Dothan, Alabama, around 1977.

1.  Management of King's Appliances

Mrs. King has managed King's Appliances since 1966. She makes decisions regarding inventory, record keeping, and filing tax returns. Mrs. King paid each of the store's monthly expenses by check and recorded those expenses in spiral notebooks. She kept canceled checks and most of the invoices. Mrs. King used spiral notebooks to keep those records from 1967 to 1998. She recorded payments for layaway sales on cards which she discarded when a customer fully paid for an item. For tax purposes, Mrs. King treated layaway sales as occurring in the year the customer fully paid for the item.

Petitioners maintained separate bank accounts for King's Appliances and the farm and a personal savings account during the years in issue. Mr. King worked part-time as a salesperson at King's Appliances during the years in issue.

2.   Incorporation of King's Appliances

King's Appliances was a sole proprietorship in 1995. Petitioners transferred their assets to King's Appliances, Inc., around January 1, 1996.  On November 16, 1998, King's Appliances, Inc., elected to be an S corporation effective January 1, 1996. The stock of King's Appliances, Inc., was held as follows:  Mr. King, 51 percent; Mrs. King, 30 percent; and petitioners' son, Howard G. King, 19 percent.

3.   Petitioners' Purchase of the South Oates Street Building

In 1977, petitioners bought a building on South Oates Street (the South Oates building) in Dothan, Alabama, for $75,000.  Mr. King served as the general contractor when they added a second floor to the building in 1978.  Petitioners paid a subcontractor $67,000 to build the shell of the addition and paid additional amounts to finish the interior of the addition.  King's Appliances occupied the South Oates building until 1990. Petitioners used it for storage from 1990 to 1996.  Petitioners sold the South Oates building in 1996 for $100,000.

4.   Petitioners' Purchase of Land for the Ross Clark Circle Building

Petitioners bought land in Dothan, Alabama, and built the Ross Clark building in 1988.  Petitioners hired a contractor to build the shell of the building for which they paid about $500,000.  After a windstorm destroyed part of the building

shell, petitioners repaired it and spent about $300,000 more to finish the building. King's Appliances was located there from 1990 until the time of trial.

D. Petitioners' Income Tax Returns for the Years in Issue

From 1977 to 1997, Mrs. King submitted records of sales, purchases, and expenses for King's Appliances to H&R Block. Glenda Williams (Ms. Williams) of H&R Block prepared: (1) Forms 1040, U.S. Individual Income Tax Returns, for petitioners for 1995, 1996, and 1997; and (2) Forms 1120S, U.S. Income Tax Returns for an S Corporation, for King's Appliances, Inc., for 1996 and 1997.

Ms. Williams referred petitioners to Harold C. Ingram (Mr. Ingram), a certified public accountant (C.P.A.), to prepare: (1) Form 1040X, Amended U.S. Individual Income Tax Return, for petitioners for 1997; (2) Form 1040 for petitioners for 1998; and (3) Form 1120S for King's Appliances, Inc., for 1998. Petitioners gave a power of attorney to Mr. Ingram on a date not specified in the record. Petitioners filed their Forms 1040 (1) for 1995, on October 15, 1996; (2) for 1996, on October 20, 1997; (3) for 1997, on October 19, 1998; and (4) for 1998, on October 18, 1999.

E. Respondent's Audit of Petitioners' Tax Years 1995-98

In 1998, Revenue Agent Angela Davis (Agent Davis) audited petitioners' tax years 1995 and 1996. Agent Davis asked

petitioners to provide their books and records pertaining to King's Appliances. Mrs. King provided her spiral notebooks, canceled checks, and most of the invoices.

Agent Davis asked petitioners to provide records showing the cost of improvements at the South Oates building. Petitioners did not provide any records.

Respondent determined that petitioners' adjusted basis in the South Oates property was $86,487; i.e., $75,000 for the purchase of the building and $67,000 for improvements, minus $55,513 for depreciation. Respondent determined that petitioners had a $13,513 gain on the sale of the building in 1996 ($100,000 sale price less $86,487 adjusted basis).

Another revenue agent audited petitioners' tax years 1997 and 1998. Respondent determined that petitioners' adjusted basis was $760,000 for the Ross Clark building and $40,000 for the parking lot. Respondent determined that petitioners were entitled to deduct depreciation in the amount of $26,492 for 1996-98.

F.    Extension of Time To Assess Tax for the Years in Issue

From 1999 to 2002, respondent asked petitioners to execute eight Forms 872, Consent to Extend the Time to Assess Tax, for the years in issue and asked King's Appliances, Inc., to execute five Forms 872 for 1996-98.

## 1.  Forms 872 Signed by Petitioners

In response to respondent's request on March 5, 1999, petitioners signed and dated a Form 872 extending the time to assess tax for 1995 to April 15, 2000.  In response to respondent's request on December 6, 1999, petitioners signed and dated a Form 872 extending the time to assess tax for 1995 to December 31, 2000.  In response to respondent's request on December 1, 2000, petitioners signed and dated a Form 872 extending the time to assess tax for 1995 to December 31, 2001.

On April 26, 2000, Appeals Officer Sandra Norman (Appeals Officer Norman) asked Mr. Ingram to ask petitioners to agree to extend the time to assess tax for 1996.  Petitioners signed and dated a Form 872 extending the time to assess tax for 1996 to December 31, 2000.

In response to respondent's request on November 20, 2000, petitioners signed a Form 872 extending the time to assess tax for 1996 and 1997 to December 31, 2001.  Mrs. King dated that Form 872; Mr. King did not.  Respondent received it on November 21, 2000.  In response to respondent's request on March 29, 2001, petitioners signed and dated a Form 872 extending the time to assess tax for 1995, 1996, and 1997 to April 15, 2002.

On March 8, 2002, respondent received a Form 872 signed but not dated by petitioners extending the time to assess tax for 1995, 1996, 1997, and 1998 to December 31, 2002.  Appeals Officer

Norman wrote to Mr. Ingram in June 2002 to ask petitioners to agree to further extend the time to assess tax for 1995, 1996, 1997, and 1998. On July 24, 2002, respondent received a Form 872 signed and dated by petitioners extending the time to assess tax for those years to December 31, 2003.

2. Forms 872 for King's Appliances, Inc.

On April 26, 2000, Appeals Officer Norman asked Mr. Ingram to ask petitioners to agree to extend the time to assess tax for King's Appliances, Inc., for 1996. On May 31, 2000, Mrs. King signed and dated a Form 872 for King's Appliances, Inc., extending the time to assess tax for 1996 to December 31, 2000. On November 20, 2000, Mrs. King signed and dated a Form 872 extending the time to assess tax for 1996 to December 31, 2001. On April 20, 2001, Mrs. King signed and dated a Form 872 extending the time to assess tax for 1996 and 1997 to April 15, 2002. Mrs. King signed but did not date a Form 872 extending the time to assess tax for 1996, 1997, and 1998 to December 31, 2002. Respondent received it on March 8, 2002. On July 22, 2002, Mrs. King signed and dated a Form 872 extending the time to assess tax for 1996, 1997, and 1998 to December 31, 2003.

G. Notice of Deficiency

Respondent issued a notice of deficiency to petitioners for their tax years 1995-98 on April 16, 2003.

OPINION

A.   Whether Respondent Timely Sent the Notice of Deficiency

Petitioners contend that the time to assess tax expired before respondent issued the notice of deficiency.  We disagree.

Generally, the Commissioner has 3 years to assess tax after a return is filed.  Sec. 6501(a).  The 3-year periods for assessing tax expired on October 15, 1999 for 1995, on October 20, 2000 for 1996, on October 19, 2001 for 1997, and on October 18, 2002 for 1998.  Respondent issued the notice of deficiency on April 16, 2003, which is later than those dates.

If the Commissioner and the taxpayer consent in writing to extend the time to assess tax before the 3-year period expires, tax may be assessed at any time before the end of the agreed period.  Sec. 6501(c)(4)(A); sec. 301.6501(c)-1(d), Proced. & Admin. Regs.  The period may be extended by later written agreements made before the previously agreed period expires.  Sec. 6501(c)(4)(A); sec. 301.6501(c)-1(d), Proced. & Admin. Regs.  The record contains 13 Forms 872 apparently signed by one or both petitioners extending the time to assess tax to December 31, 2003.

1.   Signatures on Petitioners' Forms 872

The parties agree that Mrs. King signed the five Forms 872 for King's Appliances, Inc.  However, petitioners testified that they remember signing only two of the eight Forms 872 that apply

to their personal income tax for 1995-98, and that they do not remember whether they signed any of the others. Respondent's forensic document examiner, James T. Puckett (Mr. Puckett), opined: (1) Mrs. King signed the six Forms 872 in question; (2) Mr. King signed four of the six Forms 872; and (3) Mr. King probably signed a fifth Form 872. He expressed no opinion regarding who signed one of the Forms 872. Petitioners testified that all the signatures on the Forms 872 look like their signatures. We conclude that both petitioners signed all eight of the Forms 872.

2. <u>Dates Petitioners Signed the Forms 872</u>

Petitioners point out that one or both of their signatures were not dated on the following three Forms 872:

| Undated Signature | Years | Prior Expiration | Signed by Respondent | Current Expiration |
|---|---|---|---|---|
| Mr. King | 1996 1997 | Dec. 31, 2000 Apr. 15, 2001 | Dec. 6, 2000 | Dec. 31, 2001 |
| Petitioners | 1995-98 | Apr. 15, 2002 | Mar. 19, 2002 | Dec. 31, 2002 |
| Mrs. King | 1996-98 | Apr. 15, 2002 | Mar. 19, 2002 | Dec. 31, 2002 |

Petitioners contend that these Forms 872 are invalid because some of the signatures are undated. We disagree. A Form 872 need not be dated if it was signed by both parties before the time to assess tax expired. Sec. 6501(c)(4); <u>Rutter v. Commissioner</u>, T.C. Memo. 1986-407; sec. 301.6501(c)-1(d), Proced. & Admin. Regs. Petitioners signed the three Forms 872 listed

above before the time to assess tax had expired under the 3-year rule of section 6501(a) or under previous extensions.[3]

### 3.  Conclusion

We conclude that respondent timely sent the notice of deficiency.

### B.  Whether Respondent's Determination of the Amount of Petitioners' Income for 1995-97 Was Correct

#### 1.  Whether Petitioners Had Unreported Income in 1995-97 in the Amounts Respondent Determined

Respondent determined that petitioners had unreported income of $103,141 in 1995, $6,671 in 1996, and $467 in 1997.  Of the $103,141 amount for 1995, petitioners concede that $43,822 is income, and respondent concedes that $10,200 is not income.  With respect to the remaining $49,119 for 1995, respondent contends that $39,469 is unreported income from layaway sales completed in 1995 and that $9,650 is unreported income that petitioners used to buy inventory.  Respondent also contends that petitioners had unreported income from layaway sales of $6,671 in 1996 and $467 in 1997.

##### a.  Burden of Proof With Respect to Respondent's Deficiency Determination

The burden of proving a factual issue relating to tax liability shifts to the Commissioner under certain circumstances.

---

[3]  We do not decide herein whether it was necessary for the corporation to agree to extend the time to assess tax.  See Bufferd v. Commissioner, 506 U.S. 523, 533 (1993).

Sec. 7491(a).  Petitioners do not contend that section 7491 applies.  Thus, petitioners bear the burden of proving that the determinations in the notice of deficiency are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Before relying on this presumption to establish that the taxpayer has unreported income, the Commissioner must introduce evidence linking the taxpayer to an income-producing activity. Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636; Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Petitioners contend that respondent did not do so.  We disagree. It is undisputed that petitioners engaged in several income-producing activities.  Thus, the deficiency determination is presumed to be correct, and petitioners have the burden of proving it is incorrect.  See Blohm v. Commissioner, supra.

Petitioners further contend that respondent failed to thoroughly review their books and records.  We disagree.  Nothing in the record suggests respondent did not properly consider the records petitioners provided.

b.  Whether Respondent Correctly Determined That Petitioners Received Taxable Layaway Payments in the Amount of $39,469 in 1995

Respondent determined that petitioners received, but failed to report, $39,469 of income from layaway sales in 1995.

To qualify under sec. 1.451-5(c), Income Tax Regs., for deferral of income on an agreement to provide goods, the taxpayer must (1) account for advance payments pursuant to a method described in paragraph (b)(1)(ii) of this section for tax purposes, (2) receive substantial advance payments with respect to such agreement, and (3) have on hand or have available in that year through the taxpayer's normal source of supply the kind and quantity of goods needed to satisfy the agreement in such year. Petitioners contend they received layaway deposits in 1995, and that, under section 1.451-5(c)(1)(i)(c), Income Tax Regs., that amount is not income in 1995. We disagree.

Petitioners offered no evidence showing the amount of payments they received in 1995 for layaway sales was not completed in that year. We have no basis on which to estimate the amount of those payments.

Petitioners have not shown they qualify for deferral of income under section 1.451-5(a), Income Tax Regs. Advance payments[4] may be included in income not later than the second year following the year of receipt of these payments if, among

---

[4] To qualify as an advanced payment for goods, (1) the payment must be an amount received pursuant to an agreement for sale or other disposition in the future of goods, (2) the payment must be applied against such agreement, and (3) the goods which are the subject of the agreement must be held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business. Sec. 1.451-5(a)(1), Income Tax Regs.

other requirements, (1) the taxpayer accounts for the advance payments using a method described in section 1.451-5(b)(1)(ii), Income Tax Regs.;[5] (2) the advance payments are "substantial";[6] and (3) the taxpayer attaches to his or her income tax return for each year an annual information schedule concerning advance payments, sec. 1.451-5(d), Income Tax Regs. The record does not show whether petitioners meet any of these requirements. We conclude that petitioners had unreported income from layaway sales of $39,469 in 1995.

### c. Whether Petitioners Received But Failed To Report $9,650 in Cash Income

Respondent determined that petitioners had cash income of $9,650 which they did not report in income and which they used to buy inventory. Petitioners contend that some of the $9,650 was a

---

[5] A method is described in sec. 1.451-5(b)(1)(ii), Income Tax Regs., if it results in including advance payments in gross receipts no later than the time the advance payments are included in gross receipts for purposes of the taxpayer's reports (including consolidated financial statements) to shareholders, partners, beneficiaries, other proprietors, and for credit purposes, or if the method of accounting for purposes of the taxpayer's reports results in advance payments (or any portion of those payments) being included in gross receipts earlier than for tax purposes, in the taxable year in which includable in gross receipts pursuant to the taxpayer's method of accounting for purposes of those reports.

[6] Advance payments are substantial if, under an agreement for the sale of inventoriable goods, the advance payments received during the taxable year plus the advance payments received before the taxable year under the agreement, equal or exceed the total costs and expenditures reasonably estimated as includable in inventory with respect to the agreement. Sec. 1.451-5(c)(3), Income Tax Regs.

nontaxable transfer of receipts from their timber sales. Mr. King testified that he put receipts from timber sales before 1995 into their appliance business. Mrs. King testified that money from timber sales during the years in issue was deposited in their farm account, and that she transferred it to the King's Appliances account as needed. Petitioners did not state or provide any records showing how much money they transferred.

Petitioners contend that respondent failed to prove that the $9,650 was from a taxable source. Respondent linked petitioners to several income-producing activities, and thus the deficiency determination is presumed to be correct and petitioners have the burden of proving that the $9,650 was from a nontaxable source. See Blohm v. Commissioner, supra. Petitioners did not do so. We conclude that petitioners had unreported cash income of $9,650 in 1995.

2. Whether Respondent Correctly Determined Petitioners' Gross Receipts From Sales for 1996-97

Petitioners dispute respondent's determination that they had unreported income from layaway sales in the amounts of $6,671 in 1996, and $467 in 1997. Petitioners contend that the amounts determined by respondent are greater than the amounts stated on petitioners' computerized general ledger which petitioners installed at respondent's request. However, the computerized general ledger is not in the record, petitioners did not state

the amount of gross receipts it shows, and petitioners have not shown that the computerized general ledger is correct.

### 3. Conclusion

We conclude that petitioners had unreported income and gross receipts in the amounts respondent determined for 1995-97.

### C. Whether Petitioners Are Entitled to Larger Costs of Goods Sold Than Respondent Allowed

Petitioners contend that respondent incorrectly calculated their costs of goods sold for 1995-98.[7] We disagree.

### 1. Petitioners' Opening Inventory for 1995

Petitioners contend that their opening inventory for 1995 includes $96,000 that they paid to buy air conditioners in 1994, which they sold in 1995. We disagree.

Mrs. King testified that she bought the air conditioners in 1994 and sold them in 1995, but she also testified that she did not sell most of them in the year after they were bought. Mrs. King testified that she discovered the $96,000 omission several months before trial while reviewing records, but petitioners did not offer those records in evidence. Under these circumstances, it is not clear when petitioners bought or sold the air conditioners; thus, we are not convinced that the $96,000 is includable in petitioners' cost of goods sold for 1995.

---

[7] Cost of goods sold is computed by subtracting the value of ending inventory for a year from the sum of opening inventory for and purchases during that year. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 530 n.9 (1979).

2.   Costs of Goods Sold for 1996 and 1998

Petitioners contend that respondent incorrectly calculated their costs of goods sold for 1996 and 1998.  We disagree. Petitioners cite UAL Corp. v. Commissioner, 117 T.C. 7, 10 (2001), in which we dealt with deductions of per diem allowances paid to employees.  Petitioners do not explain how UAL applies to this case or give any grounds supporting their contention.

3.   Whether Respondent Incorrectly Calculated Cost of Goods Sold for King's Appliances, Inc., for 1997

Petitioners contend that respondent incorrectly calculated the adjustment for returns and allowances for goods sold from King's Appliances, Inc., for 1997.  They contend that their records state that the amount for returns and allowances for 1997 is $37,119, and not $33,924 as allowed by respondent.  However, petitioners did not provide those records or offer any other evidence to corroborate their claim.  We sustain respondent's determination on this issue.

4.   Conclusion

We conclude that respondent correctly determined petitioners' costs of goods sold for 1995-98.

D.   Whether Petitioners Are Entitled to Larger Deductions for Depreciation Than Respondent Allowed

Petitioners contend that their basis in the South Oates and Ross Clark buildings is larger than respondent determined, and thus they may deduct more depreciation for those properties than

respondent allowed for 1995-98. Petitioners also claim that, under the mitigation provisions, sections 1311-1314, they may deduct in 1995-96 depreciation to which they were entitled for the South Oates building from 1990-96.

1. Petitioners' Adjusted Basis in the South Oates Building

Petitioners paid $75,000 for the South Oates building in 1977. They sold it in 1996. On Form 1040 for 1996, petitioners reported that their adjusted basis was $242,000.

Respondent contends that petitioners' adjusted basis in the South Oates building includes only (1) $75,000 for their purchase of the building in 1977, and (2) $67,000 to add a second story to it in 1978. Petitioners contend that, in addition to those amounts, they spent (1) $35,000 to $37,000 to remodel the building before they occupied it, (2) $35,000 to $40,000 to complete the inside of the second story addition, and (3) $9,000 to pave the parking lot. Mr. King testified that he gave all the receipts for these expenses to Mrs. King.

Petitioners testified that their records of the cost of the building and its improvements were destroyed by the flood. When a taxpayer establishes that he or she incurred a business expense but did not prove the amount of the expense, the Court may approximate the amount allowable, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), affg. in part

and remanding 11 B.T.A. 743 (1928); see <u>Bayou Verret Land Co.</u> <u>Inc. v. Commissioner</u>, 450 F.2d 850, 858 (5th Cir. 1971), affg. 52 T.C. 971 (1969). For the <u>Cohan</u> rule to apply, the Court must have some basis for estimating the amount of the expense. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).

Mr. King testified that petitioners paid $79,000 to $86,000 to remodel the first floor, finish the interior of the second story addition, and complete the parking lot. Petitioners provided no records to substantiate those amounts, but Mr. King's testimony on this point was sufficiently credible to provide a basis for our estimate. We conclude, bearing heavily against petitioners because of their of lack of substantiation, that petitioners' adjusted basis in the South Oates building includes $30,000 more than respondent allowed.

2. <u>Petitioners' Adjusted Basis in the Ross Clark Building</u>

Petitioners reported on Form 1120S for 1996 that King's Appliances, Inc., owned the Ross Clark building and that it had an adjusted basis of $940,000. Respondent determined that King's Appliances, Inc., had a basis in the Ross Clark building of $800,000 ($760,000 for the building and $40,000 for paving).

Construction of the Ross Clark building began in 1988. Petitioners said they hired a contractor to build the shell of a new building and they built the rest. Mr. King testified that they spent about $500,000, but a windstorm partially destroyed

the building shell.  Mr. King said it cost about $350,000 to repair the building and an additional $300,000 to finish it.

Petitioners testified that they had records of these improvements, but they did not produce them or explain why they did not.  Mrs. King testified that they received an insurance reimbursement when the building was partially destroyed, but she did not remember the amount or the year that they received it.

Petitioners contend that their basis in the Ross Clark building includes $350,000 in damages from the windstorm. However, Mrs. King testified that they received an insurance reimbursement for their expenses of repairing the partially destroyed building shell.  The cost of the building ($500,000 for the shell and $300,000 for improvements) totals $800,000, which is the adjusted basis respondent determined.  Petitioners have not shown that their adjusted basis exceeds this amount.

3.    Whether, Under the Mitigation Provisions (Sections 1311-1314), Petitioners May Deduct More Depreciation for the South Oates Building Than Respondent Allowed

Petitioners contend that they did not deduct all allowable depreciation for the South Oates building from 1990-96. Petitioners contend that, under the mitigation provisions (sections 1311-1314), they may (1) deduct more for depreciation for the South Oates building in 1995-96 than respondent allowed, and (2) amend their tax returns for 1990-94 or otherwise use their unclaimed depreciation deductions from those years.

Petitioners contend that Mrs. King's testimony establishes that they did not deduct depreciation to which they were entitled on the South Oates building from 1990-96.  We disagree.

The mitigation provisions allow redress of specified tax inequities despite the statute of limitations or similar barriers such as the doctrine of res judicata.  TLI, Inc. v. United States, 100 F.3d 424, 427-428 (5th Cir. 1996).  See generally Bittker & Lokken, Federal Taxation of Income, Estates & Gifts, par. 113.9 (2d ed. 1992); 2 Mertens, Law of Federal Income Tax, sec. 14.07 (2006 rev.).

The mitigation provisions apply (with exceptions not applicable here) if:  (1) The Commissioner has made a final determination, as defined in section 1313(a); (2) the determination falls within one of the specified "circumstances of adjustment" or "doubling-up" situations described in section 1312; (3) the party against whom the mitigation provisions are invoked or a related party must have maintained, with respect to the treatment of the item in question for the determination year, a position inconsistent with the treatment of the item in another year of the same or related taxpayer, and assessment of tax for that year is barred by the generally applicable period of limitation or by some other rule of law, sec. 1311(b); and (4) the party who seeks to invoke the mitigation provisions acted timely thereunder and in the proper manner to make a corrective

adjustment, sec. 1314. Secs. 1311-1314; Fong v. Commissioner, T.C. Memo. 1998-181. The party seeking to invoke the mitigation provisions bears the burden of showing that all requirements are met. Fruit of the Loom, Inc. v. Commissioner, 72 F.3d 1338, 1341 (7th Cir. 1996), affg. T.C. Memo. 1994-492; O'Brien v. United States, 766 F.2d 1038, 1042 (7th Cir. 1985).

Petitioners do not discuss whether they meet the requirements for the mitigation provisions to apply. Determination for purposes of the mitigation provision includes four things: (1) A decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, which has become final; (2) a closing agreement made under section 7121; (3) a final disposition by the Commissioner of a claim for refund; and (4) under regulations prescribed by the Commissioner, an agreement for purposes of this part, signed by the Commissioner and a taxpayer, relating to the liability of the taxpayer (or the person for whom he or she acts) in respect of a tax under this subtitle for any taxable period. Sec. 1313(a). None of these events has occurred. Thus, the first requirement is not met; i.e., there is no determination by the Commissioner.

Petitioners did not show that the second requirement is met because there is no showing that the determination falls within one of the specified "circumstances of adjustment" or "doubling-up" situations described in section 1312.

The third requirement is not met because respondent did not treat petitioners' failure to claim depreciation deductions inconsistently at any time.

We conclude that the mitigation provisions do not apply.

E.   Whether Petitioners Are Entitled to Larger Deductions for Other Expenses Than Respondent Allowed

Petitioners reported other deductions on Forms 1120S for King's Appliances, Inc., for 1996-98, including worker's compensation, freight, contract delivery, postage, employee taxes, credit card service charges, insurance, utilities, supplies, and office expenses.  Respondent determined that these deductions should be decreased by $433 for 1996, increased by $41,600 for 1997, and decreased by $738 for 1998.  Petitioners contend that they may deduct $28,063 more than they reported for 1996, $38,405 more than they reported for 1997, and $10,108 more than they reported for 1998 based on their computer-generated general ledger.  Petitioners contend that respondent has accepted some of the figures in their computerized general ledger and thus must accept all the figures in it.  We disagree.

Petitioners did not offer in evidence their computerized general ledger, testimony, or documentary evidence supporting these claims.  We sustain respondent's determination relating to these deductions for 1996-98.

F.   Whether Petitioners May Deduct Soil or Water Conservation
     Expenses

A taxpayer generally must capitalize soil and water
conservation expenses.  Sec. 263(a)(1)(C).  Section 175 provides
an exception to the general rule.  Petitioners contend that they
may deduct unspecified amounts in unspecified years for soil and
water conservation expenses under section 175.  We disagree.

To deduct soil and water conservation expenses under section
175, taxpayers must:  (1) Be engaged in the business of farming,
sec. 175(a); (2) not deduct more than 25 percent of the gross
income derived from farming during the taxable year, sec. 175(b);
(3) make expenditures consistent with a soil conservation plan
approved either by the Soil Conservation Service of the
Department of Agriculture or a comparable State agency, sec.
175(c)(3)(A); see Koramba Farmers & Graziers No. 1 v.
Commissioner, 110 T.C. 445 (1998), affd. 177 F.3d 14 (D.C. Cir.
1999); and (4) adopt a method to deduct soil and water
conservation expenses under section 175 (a) at any time with
consent from the Secretary, or (b) for the first taxable year
ending after August 16, 1954, in which the taxpayer pays or
incurs the soil and water conservation expenses that the taxpayer
seeks to deduct under the approved plan, sec. 175(d)(1) and (2).

Petitioners contend that Mr. King is engaged in the business of farming.  However, we need not decide this issue because petitioners offered no evidence and make no argument that they meet any of the other requirements of section 175.  There is no evidence that petitioners had an approved soil conservation plan, that they had consent from the Secretary to adopt the method to deduct soil and water conservation expenses under section 175, or that they adopted the method to deduct soil and water conservation expenses under section 175 in the first taxable year ending after August 16, 1954, in which they paid or incurred soil and water conservation expenses.  We conclude that petitioners may not deduct soil and water conservation expenses under section 175 for any of the years in issue.

G.   Whether Petitioners Are Liable For the Accuracy-Related Penalty for 1995-97

1.    Whether Respondent Met the Burden of Production

Respondent has the burden of producing evidence showing that petitioners are liable for the accuracy-related penalty.  Sec. 7491(c).  Respondent has met that burden by showing that petitioners:  (1) Had inadequate records and book-keeping methods; (2) overstated costs of goods sold and deductions; and (3) understated gross receipts and income.

2.  Whether Petitioners Relied on Disinterested
    Professionals

A taxpayer is not liable for the accuracy-related penalty under section 6662(a) and (b)(1) if he or she reasonably relied in good faith on advice of a competent and independent expert or tax professional who had all the information.  See United States v. Boyle, 469 U.S. 241, 250 (1985); Schwalbach v. Commissioner, 111 T.C. 215, 230 (1998).  Petitioners contend that they are not liable for the accuracy-related penalty under section 6662 for 1995-97 because they made complete disclosures to their accountants and tax professionals and relied on their advice in filing the returns.  We disagree.

Petitioners bear the burden of proving that they acted with reasonable cause and in good faith.  Higbee v. Commissioner, 116 T.C. 438, 446-449 (2001).  Petitioners have not shown that Ms. Williams from H&R Block, or Mr. Ingram, their C.P.A. at the time, had all the information needed to prepare petitioners' returns for the years in issue.  Mrs. King gave H&R Block the total amounts of sales, purchases, and expenses; she did not give them supporting documents.  We conclude that petitioners' return preparers did not have all necessary information.

3. <u>Whether Petitioners Are Not Liable for the Accuracy-Related Penalty for 1995-97 Because They Used Record-Keeping Practices That Respondent Approved in a Prior Audit</u>

Petitioners contend that they are not liable for the accuracy-related penalty for negligence for 1995-97 because they used reasonable record-keeping practices that the Commissioner approved in a prior audit. We disagree.

Petitioners cite <u>Boulez v. Commissioner</u>, 76 T.C. 209, 215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987), and <u>Fitzpatrick v. Commissioner</u>, T.C. Memo. 1995-548, to support their contention that the Court should consider the fact that the Commissioner had sent a no-change letter in weighing the appropriateness of the penalty. In <u>Boulez</u> and <u>Fitzpatrick</u>, we denied the taxpayer's request to equitably estop the Commissioner. A prior no-change letter for the years in issue did not estop the Commissioner from issuing a notice of deficiency to the taxpayer in <u>Fitzpatrick</u>. <u>Fitzpatrick v. Commissioner</u>, <u>supra</u>. Those cases do not support petitioners' position.

Mrs. King testified that King's Appliances was audited in 1969. She did not describe the issues considered in that audit or offer a no-change letter in evidence. She gave us no basis on which to consider that audit in deciding whether the accuracy-related penalty applies for 1995-97.

4.   <u>Conclusion</u>

We conclude that petitioners are liable for the accuracy-related penalty under section 6662.

To reflect concessions of the parties and the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.